Receipt number 9998-3877503

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY d/b/a DOMINION VIRGINIA POWER, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

Case No.

Judge

**FILED**

MAR 31 2017

U.S. COURT OF FEDERAL CLAIMS

**17-464 C**

## COMPLAINT

NOW COMES Plaintiff, Virginia Electric and Power Company d/b/a Dominion Virginia Power ("DVP"), by and through its undersigned counsel, and alleges the following in its Complaint:

## I.    JURISDICTION

1.    This action is an appeal of a Contracting Officer's Final Decision dated April 4, 2016, under Contract No. SP0600-04-C-8253.

2.    The Court has subject-matter jurisdiction over this action under the Tucker Act, 28 U.S.C. § 1491(a), and the Contract Disputes Act of 1978, 41 U.S.C. § 7104(b)(1).

## II.    PARTIES

3.    The Plaintiff DVP is a Virginia corporation with its principal place of business at 120 Tredegar Street, Riverside 2, Richmond, VA 23219.

4.    At all relevant times, DVP held Utility Privatization Contract No. SP0600-04-C-8253 ("Contract").

5.    The Defendant is the United States, acting through the United States Air Force ("Air Force").

### III.    INTRODUCTION

6.      This Complaint arises out of the Air Force's convenience termination of a 50-year electric utility privatization contract at Fort Monroe, Virginia.   The Air Force partially terminated the Contract 43 years early, but has refused to pay or accept liability for $13,499,634.69 in allowable costs arising out of the termination.

7.      Before Contract termination, Fort Monroe was a single parcel of property owned by the Federal Government.  The origins of the Fort date to the 1600's when it was a military defense point  for the Hampton Roads area.  From 1973 until 2011, Fort Monroe housed the U.S. Army Training and Doctrine Command ("TRADOC") and other Army activities.

8.      The Army built most of the electric utility system at Fort Monroe supporting TRADOC.   The system included a campus style single meter, lighting systems, and a distribution system, which met the Army's needs, but which did not conform to regulated standards. Compared to a system meeting regulated standards, the Army system was less  reliable and required vastly greater and more costly maintenance than a regulated system.

9.      Although Fort Monroe has always been in the DVP service territory, as a federal enclave it was exempt from state regulation.

10.     In 2004, after a competitive procurement, the Defense Energy Supply Center awarded a 50-year utilities privatization contract to DVP, covering Fort Monroe and two other bases.  The contract obligated DVP to operate, maintain, improve and own the Fort Monroe electric system, which included the metering, lighting, and distributions subsystems ("MLD"). DVP promptly began work under the contract, including an added scope of work to restore extensive damage from Hurricane Isabel.

11.     One of the Contract documents was a Bill of Sale.  The Bill of Sale conveying ownership of the utility system to DVP was "subject to" the Contract.

12.     In 2005, the Government designated Fort Monroe for closure as part of the Base Realignment and Closure ("BRAC") process.  The base had to be closed by 2011.

13.     In 2011, seven years into the 50-year Contract and after the Army transferred responsibility to the Air Force, the Air Force partially terminated the Contract for convenience, eliminating only Fort Monroe.  The termination notice stated "a desire" that DVP retain ownership of the system, but did not address any of the regulatory consequences of the termination.  As part of the process, the Government split the single contiguously-owned parcel into separate parcels, conveying parts to the Commonwealth of Virginia and retaining parcels for itself.

14.     Notwithstanding the termination, the Federal Government has at all relevant times, and through the date of this Complaint, remained the customer of record on the master utility meter serving Fort Monroe.

15.     In a nutshell, before the Contract termination, the Fort Monroe utility system was exempt from meeting regulated standards.  As a result of the Contract termination, the utility system at Fort Monroe was required to comply with state law regulated standards.  The costs to do so, in the amount of $13,499,634.69, were direct consequences of the Government's unilateral actions.  The costs are allowable costs continuing after the termination under the FAR, and payable to DVP under the FAR's fair compensation principle, and other authorities as described below.

**IV.     STATEMENT OF FACTS**

    A.     **Pre-Privatization Electric Utility System at Fort Monroe**

        1)     The Metering System

16.     The Government built the electric utility system at Fort Monroe to meet the specialized needs of the Army.  As an Army-owned installation, the electric utility system did not have to comply with regulated standards.

17.     The Army constructed a metering system using a "campus-style" metering configuration with only one master meter covering over 200 separate buildings.  (Figure 1).



**Fort Monroe**

**Metering Configuration Before Contract Termination**

• **Permissible Under Contract Before Termination**

<u>**Figure 1**</u>

This was permitted by the Contract, as there was one contiguously owned parcel of property receiving service.

18.     Incident to the Contract termination, the Federal Government split ownership of Fort Monroe, dividing the property into a federal parcel and conveying part to the Commonwealth of Virginia.  (Figure 2).

**Fort Monroe**

**Metering Configuration After Contract Termination And Existing**



- **Not Permissible After Contract Termination**
- **Configuration Violates The Virginia Terms And Conditions For Electric Service**

**Figure 2**

19.     Once the Contract was terminated and the Government divided the property, the campus-style metering was not permitted.  Regulated standards required an individual metered service at every building, approximately 224 new meter installations.  (Figure 3).

**Regulated Standard Metering Configuration**



- **Legally Required Post Contract Termination**
- **A Meter For Every Point of Service**

**Figure 3**

20.     The reason campus-style meters are not permitted on parcels owned by multiple property owners is that it results in a subsidy of costs for other customers due to under-collection of distribution costs.  The under-collection of costs is caused because the rate is based on a single customer, with a single service lateral and a single meter.  A customer receiving service through a single delivery point versus multiple delivery points has the ability to receive certain unfair pricing advantages under the company's rate schedules by:

- Diversification of load
- The "blocked" structure for kWhr charges, where more kWhrs fall in less expensive blocks when totalizing
- Qualifying for a more favorable rate schedule

2)      The Lighting System

21.      For Army purposes, the lighting system used metal halide bulbs and concrete-based aluminum poles.  The Army also wired the fixtures in series, and used a single photo cell to control many light fixtures.  (Figure 4).



**Fort Monroe**
**Lighting Configuration Before Contract Termination And Existing**

**Figure 4**

As a consequence, a failure of a single photo cell or the single lighting contactor disabled all the lights on the circuit.

22.      In contrast, a regulated lighting system would be wired using multiple circuits, multiple power supplies, and sodium lights, each with an individual photo cell.  This eliminates large lighting outages due to the failure of a single photo cell or lighting contactor.  The regulated

fixtures can be purchased and maintained at about one-half the cost compared to the existing

fixtures and poles at Fort Monroe.  (Figure 5).



**Figure 5**

3)      The Distribution System

23.     For its operational needs, the Army built the medium voltage distribution system

with many transformers connected in series.  (Figure 6).

**Fort Monroe**

**Distribution System Before Contract Termination And Existing**



• **Permissible Under Contract Before Termination**
• **Not Permissible After Contract Termination**

<u>**Figure 6**</u>

This method was less costly because it eliminated some switches and additional wiring, but in the

event of an outage, before the work to find the fault and repair could even begin, many man hours

are required to isolate each series transformer in an affected circuit.

24.     In contrast, a properly designed distribution system is built with additional

switches, more feeder cables and fewer transformers in each series circuit, allowing quicker and

less costly restoration of service during an outage.  (Figure 7).

**Fort Monroe**

**Distribution System Meeting Regulated Standards**



• **Legally Required Post Contract Termination**
• **Provides Additional Isolation Points In Circuits To Reduce**
  **Service Restoration From System (transformer or cable failures)**

**Figure 7**

25.      Overall, while the non-conforming system worked for the Army, the system did not comply with the regulated standards required in DVP's tariff.

26.      This claim seeks a judgment that, as a result of the partial termination for convenience, the Government is liable for the costs to bring the metering, lighting, and the distribution systems up to regulated standards, as shown on Figures 3, 5, and 7.

B.      **Utility Rates and the Prohibition of Cross Subsidization**

27.      The reasons the Fort Monroe MLD systems have to be brought to regulated standards, and that costs have to be incurred to pay for that work, arise out of utility regulation law.

28.     In the Company's geographic defined service territory, electric utility service provided to retail customers in the Commonwealth of Virginia is regulated by the Virginia State Corporation Commission, with certain limitations.  In Virginia, the Commission establishes the rates that may be charged to customers.

29.     Rates charged to different classes of customers (i.e., residential, small general service, worship, etc.) are a function of DVP's costs to provide the service, a rate of return, and other factors.  By law, the costs must be "just and reasonable."  Costs are "just and reasonable" when the facilities installed and the related operation and maintenance costs provide customers with reliable and efficient electric service.

30.     To provide reliable and efficient electric service at a "just and reasonable " cost – based on 100 years of experience – the Company has established equipment and design standards that enable it to optimally operate and maintain its utility system.  DVP's rates and the tariff approved by the Commission are premised on using certain equipment and system design that meet these established standards (called "regulated standards").  Following regulated standards enables the Company to provide reliable and efficient service at a lower cost to all customers.

31.     DVP's rates are also premised on a rate of return. The rate of return accounts for the different classes of utility customers, and is set to insure there is no cross subsidization between the classes of customers.  Cross subsidization is prohibited by law.[1]

---

[1]   **Code of Virginia § 56-235.2. All rates, tolls, etc., to be just and reasonable to jurisdictional customers; findings and conclusions to be set forth; alternative forms of regulation for electric companies.**

    A. Any rate, toll, charge or schedule of any public utility operating in this Commonwealth shall be considered to be just and reasonable only if: (1) the public utility has demonstrated that such rates, tolls, charges or schedules in the aggregate provide revenues not in excess of the aggregate actual costs incurred by the public utility in serving customers within the jurisdiction of the Commission, including such normalization for nonrecurring costs and annualized adjustments for future costs as the Commission finds reasonably can be predicted to occur during the rate year, and a fair return

32.     The prohibition of cross-subsidization applies to the sale of a privately owned system to the regulated utility.  If the owner/seller of a private system wanted the regulated utility to purchase and operate their system, the system could not be acquired by the regulated utility unless the owner/seller paid the necessary costs to bring the system into conformance with the regulated standards.   Compliance with regulated standards assures reliability and lower costs of operation.   Compliance also lowers the ultimate cost of service and the rates chargeable to the utility's customers.

33.     Requiring the seller to pay the costs to upgrade the system to meet regulated standards protects the utility's existing customers from paying excess costs introduced by the seller, such as enhanced maintenance costs due to pre-existing use of older equipment. Likewise, if the system had separate users but only one meter, the seller had to pay the costs for separate metering before the utility could accept the transfer.  This protects the utility's existing customers from unfairly bearing the short-term and long-term expense of bringing the seller's non-conforming (more costly and less efficient) system into the overall utility network.

34.     While the Contract covering Fort Monroe was in effect, its systems did not have to meet the regulated standards, and there were no prohibited cross-subsidization issues.  DVP's existing customers were not being asked to subsidize any costs related to Fort Monroe.   Through the Contract, the Government was bearing all the necessary costs to operate the system in "as is" condition, with the expectation that cost-saving improvements would be made over time.

35.     Once the Air Force terminated the Contract for convenience with its stated "desire" that DVP retain ownership of the system:  (1) the systems had to be brought into conformance

---

on the public utility's rate base used to serve those jurisdictional customers, which return shall be calculated in accordance with § 56-585.1 for utilities subject to such section;

with the regulated standards, and (2) the termination for convenience regulations, the FAR's fair

compensation requirement, and other applicable laws required the Government to pay the costs to

bring the nonconforming system up to the regulated standards.

C.    **The Department of Defense Utility Privatization Program**

36.    In 1996, recognizing the need for military services to exit the business of providing

utility services, Congress passed 10 U.S.C. § 2688.   This gave military departments the

contractual authority to enter into 50-year contracts with privately owned firms for military  utility

privatizations.  Under the Program, through a Bill of Sale, the Government conveys  ownership of

a military base's electric utility fixtures, systems and equipment to the contractor.

37.    The Bill of Sale states that it is "subject to" the Contract.  The Contract obligates

the contractor to furnish all necessary labor, management, supervision, permits, equipment,

supplies, materials transportation, and any other incidental services required  for the complete

ownership, operation, maintenance, repair, upgrade, and improvement of the  utility system.  The

Contract term can be up to 50 years.

38.    For access to the utility systems located on Government property, the Government

grants the contractor an easement over the real property, but fee ownership of the Federal–owned

real property remains with the Government.

39.    The Government and the contractor also agree on a purchase price payable by the

contractor to the Government for ownership of the utility system.  This amount is reflected in a

promissory note from the contractor to the Government.

40.    With respect to payment, the contractor and the Government establish a long-term

amortized monthly service charge payable by the Government to the contractor for maintenance,

operation, and capital improvements to the system.  The contactor's payments against the

promissory note are pro-rated and credited against the monthly payments the contractor receives from the Government for services and operations.

41.     This alternative financing structure allows the Government to acquire the operational services maintenance and capital improvements over a long term payment schedule, at a fraction of the loaded monthly cost the Government would have had to pay if it operated the system itself.

D.     **DVP's Contract**

42.     In 2001, the Defense Energy Support Center ("DESC") issued Solicitation No. SP0600-R-0047, for utilities privatization at three Virginia military bases:  Fort Eustis, Fort Monroe, and Fort Story.

43.     Between 2002 and 2004, in response to the Solicitation, DVP proposed, and then negotiated, the Utility Privatization Contract with DESC.

44.     On June 24, 2004, DESC awarded the instant 50-year Utilities Privatization Contract to DVP for services at Fort Eustis, VA (CLIN 0001), Fort Monroe, VA (CLIN 0007), and Fort Story, VA (CLIN 0011).  (Exhibit 1).

45.     The Contract type is a Fixed Price – Price Redetermination in accordance with FAR § 52.216-5.

46.     Section C.2.4 of the Contract stated:

> The Contractor shall assume ownership of Government utility system(s) identified herein and provide related utility service(s).  This includes, but is not limited to, the obligation to ensure adequate and dependable utility service(s) to all facilities and equipment served.

> Services provided shall comply with all applicable federal, state, and local laws and regulations, as they may be amended from time to time, including those requirements relating to health, safety and the environment. The Contractor shall modify its service practice as necessary to accomplish such compliance.

47.     The Contract also incorporated a Bill of Sale dated February 16, 2005 (Exhibit 2), memorializing the Government's conveyance of the Fort Monroe utility system to DVP and a Promissory Note documenting the payments owed by DVP to the Government for acquiring the system (Exhibit 3).

48.     The Contract also included a Real Property Easement Agreement for DVP's access to the utility systems under and around the system, Easement No. DACA65-2-05-84 (Exhibit 4). The Contract Preamble stated: "The Bill of Sale and Army Easement shall be incorporated in the Contract upon execution of these documents."

49.     Section 13 of the Contract Preamble, and other contract provisions, also incorporated DVP's State-regulated Tariff dated December 18, 2002 into the Contract, containing both pricing and terms and conditions. (Exhibit 5). Rates are designed to recover the revenue requirement with such rates being expressed in a formal document known as a "tariff." The tariff is the means to recover DVP's cost of service for providing generation, transmission and distribution services including the opportunity to earn a fair rate of return on the costs (rate base) incurred to provide such services to customers.

50.     Section I.2 of the Contract incorporated by reference, among other clauses, FAR § 52.249-2, Termination for Convenience of the Government (Sept. 1996) (Fixed Price). This stated in pertinent part:

> (g) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows, but without duplication of any amounts agreed on under paragraph (f) of this clause:
>
> (1) The contract price for completed supplies or services accepted by the Government (or sold or acquired under subparagraph (b)(9) of this clause) not previously paid for, adjusted for any saving of freight and other charges.
>
> (2) The total of--

(i) The costs incurred in the performance of the work terminated,  including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to supplies or services paid or to be paid under subparagraph (g)(1) of this clause;

(ii) The cost of settling and paying termination settlement proposals  under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision  (g)(2)(i) of this clause; and

(iii) A sum, as profit on subdivision (g)(2)(i) of this clause, determined  by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer shall allow no profit under this subdivision (iii) and shall reduce the settlement to reflect the indicated rate of loss.

(3) The reasonable costs of settlement of the work terminated, including --

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and  supporting data;

(ii) The termination and settlement of subcontracts (excluding the  amounts of such settlements); and

(iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the  termination inventory.

(h) Except for normal spoilage, and except to the extent that the Government expressly assumed the risk of loss, the Contracting  Officer shall exclude from the amounts payable to the Contractor  under paragraph (g) of this clause, the fair value, as determined by the Contracting Officer, of property that is destroyed, lost, stolen, or  damaged so as to become undeliverable to the Government or to a  buyer.

(i) The cost principles and procedures of Part 31 of the Federal  Acquisition Regulation, in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this clause.

51.     Since the award, the Government has issued 356 Contract Amendments.

E.     **Contract Performance 2004–2011**

52.     DVP fully performed the Contract to the satisfaction of the Army from the award

until termination.  On May 13, 2005, however, just eight months after the award, Fort Monroe

16

appeared on a list of military installations recommended for base closure and/or realignment.  The President approved the BRAC list on September 15, 2005, and it became  effective after expiration of the Congressional review period.

53.     After the BRAC notice, at the Army's direction, DVP continued to fulfill its responsibilities under the Contract and, in fact, performed additional work in the form of repairs to Fort Monroe caused by Hurricane Isabel.

54.     Over the seven years DVP performed the Fort Monroe portion of the Contract, DVP received approximately $6.9 million for providing service, maintenance, repairs,  and improvements to the utility system.  DVP received monthly payments from the Government during this time, but when the termination ended the Contract 43 years early and effectively converted the Contract to a cost-reimbursement contract, the Government became liable to DVP for the amount  of this claim and other allowable costs.

55.     On or about June 2010, the Army transferred administrative responsibility for the Contract to the U.S. Air Force 633 Command ("633 CONS"). Prior to that transfer and for the entire operations period before the termination, the Air Force had no contact, role or  responsibility for the utility privatization contract with DVP.

F.     **Termination for Convenience Notices and Property Transfer**

56.     On January 27, 2011, DVP received the first of two partial convenience termination notices from 633 CONS, which had assumed responsibility for administering the Contract from the Army and DESC.  Due to the joint basing of Fort Eustis with Langley Air Force Base, the Air Force, which had no prior experience with the Contract, assumed responsibility for the termination. The Termination Notice was styled as a partial termination notice  because only

Fort Monroe was being terminated.  The Contract continued for Fort Eustis and  Fort Story.
(Exhibit 6).

57.     The January notice stated it was a partial termination but was silent on any action
with respect to the easement, the Bill of Sale, system ownership, and the unpaid debt on the
Promissory Note that DVP owed the Army on the system price.

58.     On March 25, 2011, DVP met with a Technical Sergeant Goodrum to advise that
the Termination Notice failed to include terms on ownership of the system post-termination.  In
subsequent discussions, DVP informed 633 CONS that if it wanted DVP to take ownership of the
system as part of the termination, the Air Force would have to fund the costs to bring the MLD
systems up to regulated standards, because post-termination, the systems would then have  to
comply with the regulated system requirements.

59.     On June 3, 2011, 633 CONS issued a revised partial termination notice, this time
stating a "desire" that DVP retain ownership of the Fort Monroe system.  The termination notice
further stated that Fort Monroe would close on September 15, 2011, and, in accordance with  FAR
§ 52.249-2 – Termination for Convenience, CLIN 007 (Fort Monroe) would be terminated
effective September 15, 2011. (Exhibit 7).

60.     There is no contractual authorization, or precedent, for the Air Force's June 3,
2011 Termination Notice to express its "desire" for DVP to retain ownership of the system.  That
uncertain, precatory term has no legal effect and has no place in federal contract administration.

61.     Under FAR Part 49, after issuing the Termination Notice, the Contracting Officer
became bound to comply with the termination procedures at FAR § 49.105.  This states in
pertinent part:

> (a) Consistent with the termination clause and the notice of termination, the  TCO
> shall --

18

(1) Direct the action required of the prime contractor;

(2) examine the settlement proposal of the prime contractor and, when appropriate, the settlement proposals of subcontractors;

(3) Promptly negotiate settlement with the contractor and enter into a settlement agreement; and

(4) Promptly settle the contractor's settlement proposal by determination for the elements that cannot be agreed on, if unable to negotiate a complete settlement.

(b) To expedite settlement, the TCO may request specially qualified personnel to--

(1) Assist in dealings with the contractor;

\* \* \*

(v) Assist the contractor in accomplishing other disposition.

(c) The TCO should promptly hold a conference with the contractor to develop a definite program for effecting the settlement. When appropriate in the judgment of the TCO, after consulting with the contractor, principal subcontractors should be requested to attend. Topics that should be discussed at the conference and documented include--

(1) General principles relating to the settlement of any settlement proposal, including obligations of the contractor under the termination clause of the contract;

(2) Extent of the termination, point at which work is stopped, and status of any plans, drawings, and information that would have been delivered had the contract been completed;

(3) Status of any continuing work;

\* \* \*

(9) Contractor accounting practices and preparation of SF-1439 (Schedule of Accounting Information (49.602-3));

(10) Form in which to submit settlement proposals;

(11) Accounting review of settlement proposals;

\* \* \*

(13) Tentative time schedule for negotiation of the settlement, including submission by the contractor and subcontractors of settlement proposals,

termination inventory schedules, and accounting information schedules (*see* 49.206-3 and 49.303-2);

\* \* \*

62.     Other than holding a meeting in 2011 to indicate that 633 CONS could not address any of the above topics, 633 CONS failed and refused to comply with these requirements.

63.     At the same time, the Army announced its intention to convey Fort Monroe to the Commonwealth of Virginia.  The Federal Government and the Commonwealth then began a negotiation over the property transfer.

64.     Upon the effective date of the termination, Fort Monroe ceased to be a federal enclave exempt from the state regulated tariff, and instead became subject to state utility regulation.   Now subject to state regulation, the system had to be brought into compliance with regulated standards.  Given the existing physical state of the systems, DVP estimated that approximately $13,499,634.69 in improvements would have to be funded by the Air Force, as required by the termination for convenience regulations, to bring Fort Monroe's MLD systems into compliance with regulated standards.

G.     **2012 Termination Settlement Efforts**

65.     On information and belief, this was one of the first electric utility privatization contracts awarded under 10 U.S.C. § 2688 that was terminated for convenience.  There were many unknowns for the contractor on how to unwind a transaction of this sort, and how to account for the various reimbursable costs.  DVP requested 633 CONS' guidance on these issues.  In violation of the Contracting Officer's duties, 633 CONS refused to provide DVP with any of the technical assistance required under the FAR for developing this first-of-a-kind Termination Settlement Proposal ("TSP").

20

66.     After receiving the Termination Notices, DVP began contacting Contracting

Officer Lewendowski of 633 CONS to discuss the settlement issues.  Ms. Lewendowski was

generally nonresponsive and uncooperative.  DVP did inform 633 CONS of the Government's

obligation to fund the costs necessary to bring the MLD systems up to regulated standards after

the Contract was terminated for convenience.  In the absence of receiving the required guidance

from 633 CONS, DVP made its  best effort to submit an initial TSP to 633 CONS in June 2012.

H.     **BRAC Office Directs Rejection of TSP for Funding Reasons, 633 CONS Conceals Audit Information from DVP**

67.     In December 2012, 633 CONS requested the Army BRAC Office's input on

DVP's 2012 TSP.  The BRAC Office advised 633 CONS that because the BRAC Office could not

identify any BRAC funds to pay the termination, the Contracting Officer should reject the claim

and put the onus back on DVP.  (Exhibit 8).  This is a completely improper basis for rejection of a

TSP.

68.     Although 633 CONS knew that it failed to provide DVP any guidance on

preparation of the TSP, it nonetheless referred the TSP to DCAA for audit.  DCAA provided the

audit results to 633 CONS in May 2013.  The audit identified several deficiencies in the TSP.

(Exhibit 9).

69.     Per standard procedure, DCAA is required to provide the contractor an exit

conference after an audit.  One of the purposes of an exit conference is for DCAA to explain any

deficiencies so that the contractor can correct the deficiencies in a resubmittal.  Here, however,

633 CONS specifically directed DCAA *not to* provide DVP any details on the audit issues.  In

correspondence from DCAA to 633 CONS dated May 8, 2013, the DCAA auditor wrote:

> "I just want to advise you that our audit procedures require us to conduct an
> exit with the contractor upon completion of the assignment.  I remember

you  requested us not to give DVP any details on what we have in the memo
sent to  you.  However, we still need to contact them."  (Exhibit 10).

70.     It was completely improper for 633 CONS to have instructed DCAA to withhold

from DVP information DCAA was required to provide DVP in an exit conference. But DCAA

still recommended that DVP be permitted to make a resubmittal of its TSP.

71.     Instead of requesting a resubmittal from DVP per accepted procedure, 633 CONS

decided to issue a Final Decision on DVP's TSP, but again for wholly unlawful reasons.  In its

Memorandum to DCAA dated May 29, 2013 (Exhibit 11), 633 CONS wrote:

> 6.  Ultimately the recommendation to have resubmittal of the contractor
> settlement proposal is not viable due to several factors to include fiscal
> constraints and expiration of BRAC set aside funding for termination costs,
> potential negative media coverage due to a prolonged settlement and
> continued  delays between the new land–owner, the City of Hampton and
> DVP with the  claim that unresolved issues between the government and
> DVP are hindering  forward progress and causing uncertainty.  633 CONS
> intends to issue a final  decision to the contractor pending standard internal
> and external reviews and  procedures.

72.     None of 633 CONS' articulated reasons had anything to do with the merits of

DVP's TSP.  To the contrary, the grounds for rejection were arbitrary, capricious, and a plain

abuse of discretion.  The rationale reflects a lack of good faith and a complete violation of all FAR

principles related to timely and fair compensation of contractors after a termination for

convenience.

73.     In June 2013, 633 CONS prepared a Bullet Background Paper on the DVP's

Utility Privatization Contract.  Importantly, the Bullet Paper noted that: (1)  $4 million in BRAC

funds  had been allotted for the termination costs resulting from the directed closure of Fort

Monroe; (2) there were recognized allowable costs from the termination equal to "the

unrecovered capital  asset minus the upgrades paid by the Government after Hurricane Isabel and

costs for legal fees,  minus G&A; and (3) the Government estimated the calculated amount of the

settlement at $1.6 million. The Bullet Paper also noted that the BRAC funds would expire at the end of the current fiscal year, meaning September 30, 2013. (Exhibit 12).

74. 633 CONS records from June and July 2013 all reflect the understanding that the BRAC funds for the settlement would expire at the end of the fiscal year, but 633 CONS did nothing to advance the settlement before the funds expired. Through the summer of 2013, DVP made continuous inquiries to 633 CONS on the status of its termination proposal, but it was never told that $4 million in BRAC funds had been set aside to fund the settlement or that 633 CONS and DCAA had identified allowable costs estimated at $1.6 million that should be paid to DVP as part of the settlement.

75. Instead of engaging and assisting DVP with negotiation of its TSP as required under FAR § 49.105, 633 CONS blocked or refused repeated requests by DVP to discuss DVP's proposal.

76. Frustrated by months of stonewalling, in July 2013, DVP's CEO contacted Army leadership to discuss the termination settlement and to gain an understanding of the reason for delays.

77. After this contact, the Army's BRAC Program Manager reported to Ms. Lewendowski that DVP's settlement effort was to no avail because the Army had been pre-warned of DVP's efforts.

78. For blocking DVP's settlement efforts, Ms. Lewendowski responded with kudos to the Army and herself, with a "LOL" (laugh out loud) notation. (Exhibit 13).

79. Although $4 million in BRAC funding had been allotted for the termination, and both DCAA and 633 CONS recognized that DVP was owed allowable costs estimated in the $1.6 million range, 633 CONS decided to issue a final decision disallowing all compensation

except $24,190.00 in proposal preparation costs.  The Contracting Officer wrote:  "We anticipate we will be in Court soon.  We only gave them legal fees." (Exhibit 14).

80.     Citing the wrong FAR provision and without following any of the FAR termination settlement procedures, on March 7, 2014 the Contracting Officer issued a Contracting Officer's Final  Decision awarding DVP just $24,190.00 in termination proposal costs on its TSP.  The letter consisted of selected excerpts from the DCAA Audit report that 633 CONS  improperly instructed DCAA to withhold from DVP, and erroneous conclusions concerning the BRAC. (Exhibit 15).

81.     Internally, 633 CONS documents revealed that 633 CONS was issuing the final decision due to fiscal constraints, expiration of BRAC set aside funding for termination costs, and potential negative media coverage.  (Exhibit 11).  But, in the contrived Final Decision sent to DVP, 633 CONS cited audit exceptions and included a plainly erroneous statement that, because the termination resulted from BRAC, the Government was relieved of paying future costs that DVP might incur.  (Exhibit 15).

82.     On May 30, 2014, DVP filed a Request for Reconsideration and/or Clarification of the March 7, 2014 correspondence, asserting several grounds for clarification and requesting an opportunity to submit a revised proposal.  (Exhibit 16).

83.     On June 6, 2014, a new Contracting Officer, Captain Cindy Baker, agreed to re-open the consideration of DVP's termination settlement subject to receiving DVP's revised termination proposal by August 18, 2014, and other conditions.  (Exhibit 17).

I.      **DVP Efforts to Resolve the Termination 2014–2016**

84.     On August 18, 2014, DVP resubmitted its Termination for Convenience Settlement Proposal ("TSP") in conformity with FAR Part 49 as well as the cost principles detailed in FAR Part 31.  (Exhibit 18).

85.     The TSP had three components:  (1) net unrecovered costs incurred and allocated profit on contractual work performed ("NUI"); (2) the continuing costs to bring the MLD  systems up to regulated standards; and (3) post-termination settlement costs incurred in  preparation of the TSP.

86.     Despite assurances from Captain Baker in the fall of 2014 that 633 CONS was committed to resolving the DVP termination settlement as quickly as possible, other than belatedly initiating a DCAA audit on only the NUI component of DVP's TSP, Captain Baker (now civilian Air Force employee Baker) similarly failed and refused to engage with DVP.

87.     Specifically, after receiving DVP's August 2014 TSP,  the Air Force failed to negotiate and settle DVP's proposal promptly, as required by FAR § 49.105(a)(3).

J.      **Convenience Termination of a 10 U.S.C. § 2688 Utility Privatization Contract**

88.     A utility privatization contract under 10 U.S.C. § 2688 is a FAR-covered services contract, a real estate transaction, and a debt financing  vehicle.  The contract also involves state utility regulatory issues.

89.     Because the Government conveyed the electric system under a Bill of Sale that was "subject to the terms of the Contract," unless the contractor and the  Government agreed to terms conveying system ownership back to the contractor after the  Contract terminated, terminating the Contract for convenience reversed, voided, rescinded or, at a minimum, clouded title on system ownership.

90.     A termination for convenience also creates a new financial relationship between the parties.  The termination for convenience clause eliminates the contractor's right to obtain anticipated profits (here over 43 years' worth) for what would otherwise be a government breach of contract, but converts the fixed-price contract to a cost-reimbursement model.

91.     Upon the termination for convenience, the Government became obligated to pay DVP for its allowable costs per FAR § 52.249-2 and the cost principles of FAR Part 31, subject to the general principles of FAR Part 49.201.

92.     The general principles of FAR § 49.201(a) obligate the Government to compensate the contractor fairly in termination for convenience settlements.

93.     Debits and credits to both parties also had to be calculated for a final settlement. The Promissory Note and the Bill of Sale for the system also had to be cancelled or amended to reflect the termination.

94.     In administering the termination between 2011 and 2016, 633 CONS did not reconcile the debits and credits between the parties, did not reach new terms conveying system ownership to DVP outside of the Contract, did not negotiate the termination for convenience payment due to DVP for the MLD costs, did not return the Promissory Note to DVP, or amend the Easement.

95.     633 CONS unreasonably delayed entering into any negotiations with DVP over DVP's TSP.  Instead, in March 2015, seven months after 633 CONS received DVP's 2014 TSP, 633 CONS finally requested a DCAA audit of DVP's TSP.  The audit was not completed until September 2015.

K.     **DVP Compelled to Initiate Disputes Process on NUI and MLD Claims**

96.     Because 633 CONS had failed to open any substantive discussions on DVP's TSP in the five years after DVP's receipt of the Termination Notice, DVP had no alternative but to move its TSP to the contracts disputes process.

97.     DVP bifurcated its TSP into two Contract Disputes Act claims:  one for NUI and a second for MLD.

98.     On October 16, 2015, DVP submitted to the Contracting Officer a Request for Final Contracting Officer's Decision on the NUI Component of DVP's TSP and NUI-associated Settlement Costs.

99.     The Contracting Officer failed to respond to DVP's claim within the required 60-day period.

100.     On December 22, 2015, DVP appealed the deemed denial of this Request for Final Contracting Officer's Decision to the Armed Services Board of Contract Appeals in ASBCA No. 60383.  As amended, the final amount sought in DVP's Request for Final Decision was $1,659,241.

101.     After limited proceedings before the ASBCA, in September 2016 DVP and the Air Force reached a settlement on the NUI Component of DVP's claim and for associated settlement proposal costs, in the amount of $1,543,694, reserving DVP's right to pursue this MLD claim separately.  (Exhibit 19).

102.     As of the date of this Complaint, the Government has only partially paid this agreed settlement amount.

27

L.    **Contracting Officer's Final Decision on MLD Claim**

103.    On February 5, 2016, DVP submitted to the Contracting Officer a Request for Final Contracting Officer's Decision on its MLD costs, MLD-associated settlement costs in the amount of $13,499,634.69, and on non-monetary claims.  (Exhibit 20).

104.    On April 5, 2016, the Contracting Officer issued a Contracting Officer's Final Decision denying the MLD Component and DVP's non-monetary claims, but granting partial associated Settlement Costs in the amount of $92,173.50.  (Exhibit 21).

105.    In response to DVP's assertion that the Air Force violated FAR § 49.105(a)(3), which states that "the CO shall promptly settle terminations," the Final Decision erroneously asserted "there is no timeframe for which a settlement must occur."

106.    Without reference to the termination for convenience clause cited extensively in DVP's TSP, the cost principles at FAR Section 31.205-(42)(b), or any of the other cases or regulations cited in DVP's TSP and claim, the Contracting Officer's entire rationale for rejecting DVP's MLD claim was "there is no contract term or condition that supports this claim." (Exhibit 21).

107.    In response to DVP's claim on the defective termination and failed ownership transfer, the Final Decision stated: "Additionally, DVP owns the electrical distribution system at Fort Monroe as evidenced by the Bill of Sale dated 16 Feb 2005, therefore they are responsible for all upgrades on the system after the termination date."  (Exhibit 21).

108.    The Contracting Officer's Final Decision on DVP's MLD claim was at best superficial and cursory, reflected nominal to no thought, and fell below the expected standard of care for a response to a Request for Final Contracting Officer's Decision on a claim of this nature.

## V.      CLAIMS FOR RELIEF

### COUNT I

### TERMINATION FOR CONVENIENCE – ALLOWABLE COSTS

109.    DVP incorporates Paragraphs 1-108 as if fully stated herein.

110.    The Contract includes the Termination for Convenience Clause at FAR § 52.249-2.

111.    The Defendant exercised the termination for convenience clause on CLIN 0007 (Fort Monroe) by virtue of two Termination Notices, dated January 7, 2011 and June 11, 2011.

112.    On a fixed-price contract, a Termination for Convenience eliminates the contractor's right to recover anticipated profits, but effectively converts the contract to a cost reimbursable contract.

113.    Upon a termination for convenience, the financial entitlement of the contractor becomes governed by the allowable cost provisions of the FAR Part 31 subject to the fairness principles of FAR Part 49.

114.    The allowable cost provisions at FAR Part 31 include FAR Section 31.205-42, titled "Termination Costs."

115.    FAR Section 31.205-42(b) states in pertinent part:

> Contract terminations generally give rise to the incurrence of costs or the need for special treatment of costs that would not have arisen had the contract not been terminated. The following cost principles peculiar to termination situations are to be used in conjunction with the other cost principles in Subpart 31.2:
>
> * * *
>
> (b) *Costs continuing after termination.*  Despite all reasonable efforts by the contractor, costs which cannot be discontinued immediately after the effective date of termination are generally allowable. However, any costs continuing after the effective date of the termination due to the negligent or willful failure of the contractor to discontinue the costs shall be unallowable.

116.    Per the Defendant's June 11, 2011 Notice of Termination expressing Defendant's "desire" that DVP retain ownership of the electric utility system, the system became subject to DVP's Regulated Tariff and included in DVP's Rate Base.

117.    DVP's Regulated Tariff and the Rules and Regulations of the Virginia Corporation Commission require that a utility system acquired by DVP be brought up to regulated standards at the expense of the seller as a condition of being included in DVP's Rate Base.

118.    DVP estimates that approximately $13,499,634.69 in costs must, under the above termination principle, be funded by the Defendant to bring the metering, lighting, and distribution systems into compliance with DVP's regulated tariff.

119.    But for the termination, and the Defendant's expressed "desire" that DVP take ownership of the system, the Fort Monroe utility system would not have been added to DVP's Rate Base, the MLD systems would not have to meet regulated standards, and the MLD costs to bring the systems up to regulated standards would not have to be expended.

120.    The MLD costs are costs that flow from the termination and are thus allowable costs continuing after termination within the meaning of FAR § 31.205-42(b).

121.    Judgment should be rendered for the DVP in the amount of $13,499,634.69 for the allowable MLD costs.

## COUNT II

## TERMINATION FOR CONVENIENCE – FAIR COMPENSATION (FAR § 49.201)

122.    DVP incorporates Paragraphs 1-121 as if fully stated herein.

123.    FAR § 49.201(a) obligates the Government to compensate the contractor fairly in termination for convenience settlements and notes that fair compensation is a matter of judgment.

124.    Fairness requires that the Government take full financial responsibility for the consequences of terminating the Fort Monroe portion of the contract for convenience 43 years early, and for triggering the regulatory obligation and costs to bring the MLD systems up to regulated standards.

125.    It would be both unfair and unlawful for the Government to walk away from the transaction without funding the costs to bring the MLD systems up to regulated standards and without accepting financial responsibility for upgrading the inefficient and expensive system it left at Fort Monroe.

126.    Judgment should be rendered for DVP in the amount of $13,499,634.69 for costs necessary to bring the system up to regulated standards.

## COUNT III

## DEFECTIVE TERMINATION

127.    DVP incorporates Paragraphs 1-126 as if fully stated herein.

128.    The Bill of Sale stated that it was "subject to" the Contract.

129.    When the Defendant terminated the Contract, the Bill of Sale also terminated.

130.    The Defendant could not and did not unilaterally reconvey the system to DVP by virtue of expressing its "desire" that DVP retain ownership of the system in Defendant's amended second notice of termination issued on June 3, 2011.

131.    Neither the Contract, the FAR, nor any other principle of law allows or authorizes the Government to change the legal relationship of the parties, or to convey ownership of a parcel of real property by means of an expressed "desire."

132.    Before the effective date of the termination, Defendant was on notice that upon a termination for convenience, the Defendants would have to fund the costs necessary to bring the MLD systems up to regulated standards.

133.    The Defendant's use of the "desire" convention in its amended termination notice was an attempt to use precatory and ambiguous language to evade its obligation to fund the MLD costs it knew had to be paid when the system became subject to the regulated standards and was put in DVP's rate base.

134.    The termination could only be lawful, complete and non-defective if, incident to the termination, the Government compensated DVP for the costs to bring the system up to regulated standards so that it could be owned by DVP and accepted into the rate base without adverse impact to other customers in the rate base.

135.    To cure the defective termination, judgment should be rendered for DVP in the amount of $13,499,634.69 for costs necessary to bring the system up to regulated standards.

**COUNT IV**

**BREACH OF CONTRACT**

136.    DVP incorporates Paragraphs 1-135 as if fully stated herein.

137.    FAR § 31.205–42(b) and FAR § 49.201 obligated the Government to compensate DVP for its costs continuing after termination, and to fairly compensate DVP after termination for convenience.

138.    The Defendant breached the Contract by denying DVP any compensation for the MLD costs as described herein.

139.    DVP has been damaged by Defendant's breach, as DVP has neither received the funds necessary to bring the MLD systems up to regulated standards, nor an agreement by the Government to accept financial responsibility and liability for those costs.

## VI.    PRAYER FOR RELIEF

WHEREFORE, DVP prays for judgment against the Defendant as follows:

A.    Enter judgment in favor of DVP and against the Defendant that DVP is entitled to its allowable costs pursuant to FAR § 31.205-42(b);

B.    Enter judgment in favor of DVP and against the Defendant that DVP is entitled to fair compensation pursuant to FAR § 49.201;

C.    Enter judgment in favor of DVP and against the Defendant that the Defendant's termination was defective;

D.    Enter judgment in favor of DVP and against the Defendant that Defendant breached the Contract under the FAR § 31.205-42(b) and FAR § 49.201;

E.    Award DVP the sum of thirteen million, four hundred ninety-nine thousand, six hundred thirty-four dollars and 69/100 cents ($13,499,634.69), together with interest and costs as allowed by law; and.

F.    Grant such other and further relief as the Court deems just and proper.

DATED:  March 31, 2017

Respectfully submitted,

 /s/ Paul M. Honigberg_____
Paul M. Honigberg
Blank Rome LLP 1825 Eye Street, N.W., Suite 1200
Washington, D.C. 20006
Tel. (202) 772-5955
Fax (202) 572-8374
Honigberg@BlankRome.com
*Attorney for Virginia Electric and Power Company*
*d/b/a Dominion Virginia Power*

*Of Counsel*
Albert B. Krachman,  Krachman@BlankRome.com
Scott Arnold, SArnold@BlankRome.com

| Exhibit | Description |
|---------|-------------|
| 1 | June 24, 2004 Privatization Contract |
| 2 | February 16, 2005 Bill of Sale |
| 3 | February 17, 2005 Promissory Note |
| 4 | February 16, 2005 Real Property Easement Agreement |
| 5 | December 18, 2002 DVP State-regulated Tariff |
| 6 | January 27, 2011 Termination Notice |
| 7 | June 3, 2011 Revised Termination Notice |
| 8 | December 6, 2012 request for Army BRAC Office input |
| 9 | May 8, 2013 DCAA Audit results |
| 10 | Correspondence from DCAA to 633 CONS dated May 8, 2013 |
| 11 | May 29, 2013 633 CONS Memorandum to DCAA |
| 12 | June 6, 2013 633 CONS Bullet Background Paper |
| 13 | August 1, 2013 Email from Cynthia Lewandowski to Stacey Ellingsen and Bradley Benedictus Re: Fort Monroe – DVP |
| 14 | March 21, 2014 Email from Cynthia Lewandowski to James Foster and Bradley Benedictus Re: Contracting Officer's Decision on Settlement of Partial Termination for Convenience of CLIN 0007 Contract # SP0600-04-C-8253 |
| 15 | March 7, 2014 Final Contracting Officer's Decision |
| 16 | May 30, 2014 DVP Request for Reconsideration |
| 17 | June 6, 2014 agreement to reopen consideration |
| 18 | August 18, 2014 Termination for Convenience Settlement Proposal |
| 19 | September 2016 Settlement |
| 20 | February 5, 2016 Request for Final Contracting Officer's Decision |
| 21 | April 5, 2016 Final Contracting Officer's Decision |

## CERTIFICATE OF SERVICE

I hereby certify that, on this 31st day of March 2017, a true and correct copy of the

foregoing Complaint, with exhibit list, was served via the Court's CM/ECF system on

Defendant's counsel of record at its last known address, as follows:

> Commercial Litigation Branch
> Civil Division
> United States Department of Justice
> Washington, D.C. 20044


Date:  March 31, 2017                    Respectfully submitted,

                                         /s/ Paul M. Honigberg
                                         _____
                                         Paul M. Honigberg
                                         Blank Rome LLP
                                         1825 Eye Street, N.W., Suite 1200
                                         Washington, D.C. 20006
                                         Tel. (202) 772-5955
                                         Fax (202) 572-8374
                                         Honigberg@BlankRome.com

                                         *Attorney for Plaintiff*
                                         *Virginia Electric and Power Company d/b/a*
                                         *Dominion Virginia Power*