No. 17-464C
(Senior Judge Bruggink)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

VIRGINIA ELECTRIC AND POWER COMPANY,
d/b/a DOMINION VIRGINIA ENERGY,

Plaintiff,

v.

UNITED STATES,

Defendant.

---

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

PATRICIA M. MCCARTHY
Assistant Director

OF COUNSEL:

ERIKA L. WHELAN RETTA
Trial Attorney
Air Force Legal Operations Agency

BARBARA E. THOMAS
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0461

October 7, 2019

Attorneys for Defendant

## TABLE OF CONTENTS

QUESTIONS PRESENTED...................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

I.  2001-2004: The Department Of Defense Requests Proposals And Issues A Contract For The Privatization Of Electrical Distribution Systems At Three Virginia Military Installations .................................................................................................................. 2

II.  February 2005: The Army Conveys The Fort Monroe Electrical Distribution System To Dominion .................................................................................................................... 6

III.  2005-2011: Fort Monroe Is Selected For Closure, And The Army Partly Terminates The Privatization Contract For Convenience ...................................................................... 8

A.  The Government Announces The Future Closure Of Fort Monroe, And Virginia Plans To Assume Ownership Of Fort Monroe Real Property ................................ 8

B.  The Air Force Announces The Planned Termination Of CLIN 0007; Virginia Creates The Fort Monroe Authority; And Dominion Presents Post-Termination "Options" .................................................................................. 9

C.  The Air Force Issues A Revised Termination Notice, And Dominion Submits Its Termination Settlement Proposal, Which Includes No Claim For Upgrade Expenses ...................................................................................................... 12

IV.  Post-Termination: Dominion Provides Electric Service To The Fort Monroe Site Pursuant To A New Contractual Arrangement, And Submits A Series Of Termination Settlement Demands .................................................................................................. 13

A.  The Army And Dominion Execute A New Agreement To Provide For Continued Service To The Master Meter At The Fort Monroe Site.................... 13

B.  Dominion Repeatedly Revises Its Termination Settlement Proposal.................. 15

C.  Dominion Submits Successive Certified Claims And Pursues One Before The Board of Contract Appeals...................................................................... 18

D.  The Air Force Denies The Claim For Upgrade Expenses, But Settles Dominion's Board Appeal For $1.5 Million...................................................... 20

V.  Post-Termination: While Dominion Pursues Its Claims, The Army Transfers Large Portions Of The Fort Monroe Site To Virginia, And The FMA Reimburses The Army For The Service Provided By Dominion Under The Areawide Contract.......................... 21

VI.    The Allegations Of Dominion's Amended Complaint ....................................... 23

ARGUMENT ................................................................................................................. 24

I.    Standard Of Review ............................................................................................. 26

II.    Summary Judgment Should Be Granted In Favor Of The United States As To
Counts I, II, And IV ............................................................................................. 27

   A.    Dominion Cannot Prevail On Its Claims Because The Government Is Not
Obligated By The Termination Clause To Pay Upgrade Expenses ..................... 27

   B.    Dominion Cannot Prove That The Upgrade Expenses Are Allocable To The
Privatization Contract ........................................................................................ 33

III.    Judgment Should Be Entered In Favor Of The United States As To Count III Of
Dominion's Complaint .......................................................................................... 34

IV.    Dominion Has No Claim For An Equitable Adjustment; The Court Would Lack
Jurisdiction To Entertain Such A Claim; And The Claim Would Be Meritless In Any
Event .................................................................................................................... 36

V.    Dominion Cannot Substantiate The Central Premise Upon Which Its Claims Rest ......... 39

   A.    Dominion's Status As A Virginia Utility ............................................................ 40

   B.    Dominion's Legal Obligations With Respect To Fort Monroe ............................ 42

CONCLUSION............................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................................................ 28

*Commonwealth v. Virginia Elec. & Power Co.*,
    201 S.E.2d 771 (Va. 1974)...................................................................................................... 44

*Do-Well Mach. Shop, Inc. v. United States*,
    870 F.2d 637 (Fed. Cir. 1989)................................................................................................. 40

*Emeco Indus., Inc. v. United States*,
    202 Ct. Cl. 1006 (1973) .......................................................................................................... 29

*Iowa Bankers Benefit Plan v. United States*,
    143 Fed. Cl. 148 (2019) .......................................................................................................... 39

*K-Con Bldg. Sys., Inc. v. United States*,
    778 F.3d 1000 (Fed. Cir. 2015)............................................................................................... 39

*Kroger Co. v. Appalachian Power Co.*,
    422 S.E.2d 757 (Va. 1992)...................................................................................................... 43

*Manloading & Mgmt. Assocs., Inc. v. United States*,
    198 Ct. Cl. 628 (1972) ............................................................................................................ 30

*Northrop Grumman Sys. Corp. v. United States*,
    140 Fed. Cl. 249 (2018) .......................................................................................................... 39

*Raytheon Co. v. United States*,
    747 F.3d 1341 (Fed. Cir. 2014)............................................................................................... 39

*Redland Co., Inc. v. United States*,
    97 Fed. Cl. 736 (2011) ............................................................................................................ 39

*Rumsfeld v. United Technologies Corp.*,
    315 F.3d 1361 (Fed. Cir. 2003)......................................................................................... 41, 42

*SWR, Inc.*,
    ASBCA No. 56708, 15-1 BCA ¶ 35832 (2014) .................................................................... 30

*Virginia Elec. & Power Co.*,
    Case No. PUE-2016-00048, Hearing Examiner Report, 2016 WL 6825375 (Va. S.C.C.
    Nov. 14, 2016) ......................................................................................................................... 44

## Statutes

Contract Disputes Act, 41 U.S.C. §§ 7101-09 ............................................................................ 39

VA Code § 56-1 ............................................................................................................................ 43

VA Code § 56-232 ........................................................................................................................ 42

VA Code § 56-234 ........................................................................................................................ 42

VA Code § 56-234.2 ..................................................................................................................... 43

VA Code § 56-235 ........................................................................................................................ 43

VA Code § 56-236 ........................................................................................................................ 42

VA Code § 56-581 ........................................................................................................................ 43

## Rules

RCFC 56(a) ................................................................................................................................... 28

## Regulations

48 C.F.R. § 2.101 (2004) ............................................................................................................. 33

48 C.F.R. § 31.201 ....................................................................................................................... 35

48 C.F.R. § 31.201-2 (2004) ........................................................................................................ 35

48 C.F.R. § 31.201-4 (2004) ................................................................................................... 35, 36

48 C.F.R. § 31.205-42(b) .................................................................................................. 20, 29, 34, 40

48 C.F.R. § 49.201 ....................................................................................................................... 35

48 C.F.R. § 49.202 ........................................................................................................................30

48 C.F.R. § 52.249-2 (2001) ................................................................................................ *passim*

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY d/b/a DOMINION VIRGINIA ENERGY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 17-464C |
| THE UNITED STATES OF AMERICA, | ) ) ) | Senior Judge Bruggink |
| Defendant. | ) ) | |

### DEFENDANT'S OPPOSITION
### TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
### <u>JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court grant summary judgment in favor of the United States in this matter and deny the motion for partial summary judgment filed on September 6, 2019 by plaintiff, Virginia Electric and Power Company (Dominion).

### <u>QUESTIONS PRESENTED</u>

1.      Whether the United States is entitled to the entry of judgment in its favor as to Counts I, II, and IV of plaintiff's amended complaint because the termination-for-convenience clause contained in the contract at issue in this matter does not require the payment of the costs claimed by plaintiff, and/or because the costs sought are not allocable to the contract.

2.      Whether the United States is entitled to the entry of judgment in its favor as to Count III of plaintiff's amended complaint because that count lacks any basis in law or fact.

3.      As to the argument presented in plaintiff's dispositive motion that Dominion is entitled to an equitable adjustment under the contract's termination-for-convenience clause, *see* Pl.'s Mot. 34-36:

a.      Whether that argument must be rejected because it is not based upon a claim pled in plaintiff's complaint or presented to the contracting officer.

b.      In the alternative, whether the United States is entitled to summary judgment as to any claim associated with this argument because Dominion's request for an equitable adjustment is untimely and lacks any legal or factual support.

4.      As an additional, independent ground for the entry of judgment in favor of the United States: whether the central premise underlying Dominion's claims lacks substantial support in law or fact.

## STATEMENT OF FACTS

**I.      2001-2004: The Department Of Defense Requests Proposals And Issues A Contract For The Privatization Of Electrical Distribution Systems At Three Virginia Military Installations**

In March 2001, the Defense Energy Support Center – sometimes called "DESC" – issued Solicitation No. SP0600-01-R-0047 (the solicitation), "seek[ing] offerors to assume ownership, operation and maintenance of" specified "utility infrastructures" at four Army installations in Virginia: Fort Eustis, Fort Lee, Fort Story, and Fort Monroe.  Def.'s Prop. Findings of Uncontroverted Fact (DPFUF) ¶ 2.  The transaction contemplated was called "privatization," and "described as the total divestiture of a utility system through the transfer and conveyance of the installation's utility infrastructure assets in conjunction with and for the purpose of the conveyee providing utility distribution services on a long-term basis."  *Id.* ¶ 3.

Among the utility systems that DESC sought to privatize through the solicitation was the electrical distribution system at Fort Monroe in Hampton, Virginia.  DPFUF ¶¶ 4-5.  At the time of the solicitation's issuance in 2001, Fort Monroe "encompasse[d] 568 acres," roughly 100 of them underwater, and housed the Army's Training and Doctrine Command (TRADOC).  *Id.*

¶ 6(a).  The Army owned and operated an electrical distribution system within Fort Monroe.  *Id.*

¶ 6(b).  That system included, among other components, several miles of "primary distribution

lines," more than 100 transformers, a switchgear station, and more than 500 "street light

fixtures."  *Id.*  Electricity was supplied to that system by Dominion pursuant to a contract with

the Government.  *Id.* ¶ 6(c).  Dominion provided electric service to a "primary meter" located at

a 13.2 kV delivery point "near the center of the installation."  *Id.* ¶ 6(d).  The electricity was then

distributed to the various facilities within Fort Monroe by the Army's distribution system.  *Id.*

From 2001 through 2003, Dominion submitted several proposals in response to DESC's

solicitation, offering to enter into a contract for the privatization of the electrical distribution

systems at Fort Eustis, Fort Story, and Fort Monroe.  DPFUF ¶ 7.  On June 24, 2004,

representatives of DESC and Dominion executed Contract No. SP0600-04-C-8253 (the

privatization contract), which established three contract line item numbers (CLINs) for the

privatization of the electricial distribution systems at Fort Eustis (CLIN 0001), Fort Story (CLIN

0011), and Fort Monroe (CLIN 0007).  *Id.* ¶ 8.

The privatization contract provided:

> The Contractor shall furnish all necessary labor, management,
> supervision, permits, equipment, supplies, materials,
> transportation, and any other incidental services required for the
> complete ownership, operation, maintenance, repair, upgrade, and
> improvement of these utility systems.

DPFUF ¶ 9(b).  No electricity was sold or purchased through the contract, *id.* ¶ 18, and the

contract itself did not effect the conveyance of any utility systems to Dominion.  Under a section

called "Transfer of Title," the contract provided:

> A general description of the utility system assets to be transferred
> is included in the utility-specific attachments (Section J01, J07,
> and J11).  Prior to the transfer of title, such facilities shall continue
> to be owned by the Government.  Transfer of title shall be

> accomplished by Easement.  The Easement shall provide the
> complete list of all assets to be sold (Attachment J31).
>
> The parties shall prepare and execute such additional documents as
> may be necessary to implement the ownership transfer.

*Id.* ¶ 9(e); *see also id.* ¶ 9(d) ("The conveyance will be documented by the Easement . . . .").  The

conveyance of the distribution systems was specifically excluded from the reach of the Federal

Acquisition Regulation (FAR):

> The conveyance of the utility system is authorized by and
> conducted under 10 USC § 2688.  The conveyance of the utility
> system is not an acquisition and therefore is not subject to the FAR
> and its supplements.  The acquisition of utility *services* is an
> acquisition and will be governed by the FAR and its supplements.

*Id.* ¶ 9(c) (emphasis added).

With respect to the services to be furnished by Dominion, the contract required that the

distribution systems at issue "be operated and maintained in accordance with all applicable

federal, state, and local laws/regulations," including, "[a]t a minimum, . . . best engineering and

management practices consistent with" the National Electric Safety Code, the National Electric

Code, and "current reference materials published by the Institute of Electrical and Electronic

Engineers (IEEE), the Illuminating Engineering Society (IES), and the Insulated Cable Engineers

Association (ICEA)."  DPFUF ¶ 10(e).  Dominion was required to make "Initial Capital

Upgrades," defined as "those repair, replacement, and improvement activities of the Contractor

required to bring the utility system, as purchased, up to legally applicable regulatory standards or

the standards typically maintained by the Contractor on its utility systems so that subsequent

renewals and replacements will permit the long-term safe and reliable operation of the utility

system."  *Id.* ¶ 10(f).  Dominion identified the upgrades required to meet those standards in its

proposals, and the upgrades so identified were listed in Schedule B-2 of the contract.  *Id.* ¶¶ 10(f)-(g), 11-12.

The contract also provided that, during the contract term, Dominion would make "[r]enewals and replacements" – defined as "investments in the utility system to renew or replace system components that fail or reach the end of their useful life."  DPFUF ¶¶ 10(i), (j), 16. Dominion could propose, on an annual basis, "Future Capital Upgrades," defined as "investments in the utility system resulting from changes in the requirements, law or regulations," or "the implementation of new technologies."  *Id.* ¶ 10(h).  The Government "reserve[d] the right to determine at its discretion, whether it w[ould] pay for any portion of proposed upgrades."  *Id.* ¶ 10(k).

Pursuant to the contract, the Government was to pay for Dominion's services by making a monthly payment whose amount was derived from two components: a "Fixed Monthly Charge" that paid for "operations and maintenance and renewals and replacements," and a "Monthly Credit" equal to "the monthly portion of the purchase price [of the distribution system] which will be credited to the Government over the number of months proposed by the offeror." DPFUF ¶¶ 15-16.  The "price of each initial capital upgrade proposed by the offeror" was to "be added to the Fixed Monthly Charge, for the number of months indicated, when the upgrade" was "put in useful service."  *Id.* ¶ 10(g).

Under the heading "Contract Term," the contract provided: "The Contractor(s) agrees to furnish, and the Government agrees to purchase, utility distribution services, in accordance with the terms and conditions of this solicitation, for a period of 50 years commencing with the Performance Start Date (Section C13.1)."  DPFUF ¶ 13.  The Performance Start Date for Fort Monroe was "150 calendar days after the contract award date."  *Id.* ¶ 14.

Dominion was specifically authorized, "at the end of the contract term," to "submit a claim for unrecovered investments."  DPFUF ¶ 9(f).  The contract provided:

> Any such claim shall be resolved in accordance with the principles set forth in DFARS 217.171(a)(2)(i) by taking into account the remaining commercial value of the investments.  The parties anticipate that at its expiration this contract may be renewed at mutually satisfactory terms.  If the contract is renewed, no claim for unrecovered investments shall be allowed.  If the contract is not renewed and DVP's claim for unrecovered investments is allowed, the Government may, at its sole option, reacquire the electric distribution system in its entirety for the amount of the unrecovered investment claim settlement without additional compensation.  The reacquisition shall be effective upon payment of the unrecovered investment claim settlement.  In the event the Government exercises its reacquisition option, the electric system shall be tendered to the Government free of liens or encumbrances of any kind.

*Id.*

The contract incorporated by reference a number of FAR provisions, including clause 52.249-2 (September 1996), titled "Termination for Convenience of the Government (Fixed Price)."  DPFUF ¶ 19.  That clause provides, in part:

> The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest.  The Contracting Officer shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.

48 C.F.R. § 52.249-2 (2001).

## II.     February 2005: The Army Conveys The Fort Monroe Electrical Distribution System To Dominion

On February 16, 2005, representatives of Dominion and the Government executed Easement No. DACA65-2-05-34 (the easement).  DPFUF ¶ 20.  Pursuant to that document, the United States granted Dominion "an easement . . . over, across, in and upon lands of the United

6

States" for "construction, operation, maintenance, repair and replacement of" the Fort Monroe electric utility system. *Id.* ¶ 21. The easement also effected the transfer of title to the utility system from the Government to Dominion, stating in a section entitled "TRANSFER OF OWNERSHIP": "The ownership of the Fort Monroe Military Installation's electrical system is hereby transferred by the Government and accepted by the Grantee." *Id.* ¶ 22; *see id.* ¶ 9(d)-(e).

The easement specified that it would "not merge" with the privatization contract, and that, instead, "the terms and conditions of each shall survive the execution and delivery of this easement and any subsequent recordation thereof." DPFUF ¶¶ 23-24. Under a paragraph titled "TERMINATION," the easement provided: "This easement may be terminated by the Secretary in whole or in part upon ninety (90) days written notice to the Grantee if the Secretary shall determine that the right-of-way hereby granted interferes with the use or disposal of said land by the United States, or it may be revoked by Secretary . . . upon termination of the utility distribution contract between the Government and the Grantee." *Id.* ¶ 25.

Also on February 16, 2005, a representative of the United States executed a bill of sale providing: "The United States of America . . . hereby sells, transfers and conveys to the Virginia Electric and Power Company . . . ALL THOSE CERTAIN facilities and equipment . . . comprising the Fort Monroe, Virginia electrical system . . . ." DPFUF ¶ 26. A representative of Dominion also signed the bill of sale. *Id.* ¶ 27. Modification 4 to the privatization contract incorporated the easement and the bill of sale into the contract by reference, along with a promissory note pursuant to which Dominion borrowed the purchase price of the electrical system from the Government. *Id.* ¶¶ 28-29.

### III.   2005-2011: Fort Monroe Is Selected For Closure, And The Army Partly Terminates The Privatization Contract For Convenience

#### A.   The Government Announces The Future Closure Of Fort Monroe, And Virginia Plans To Assume Ownership Of Fort Monroe Real Property

In 2005, the Army installation at Fort Monroe was selected for closure pursuant to the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, as amended by several later statutes.  DPFUF ¶ 30.  Closure of the base was to occur by 2011.  *Id.*

The planned closure of the military installation at Fort Monroe had implications for the real property (the Fort Monroe Site) on which the installation was located.  Approximately 285 acres of the Fort Monroe Site was conveyed to the United States by the Commonwealth of Virginia pursuant to two deeds issued in 1838 and 1936, respectively.  DPFUF ¶ 31.  Those deeds provided that title to the property conveyed would revert to the Commonwealth of Virginia if the property ceased to be used for "fortification or national defense." *Id.* ¶ 32.

In March 2007, Virginia passed legislation authorizing the state's governor to transfer any state property interest in the Fort Monroe Site to the Fort Monroe Federal Area Development Authority (FMFADA), an entity to be established by the City of Hampton, Virginia. 2007 Va. Acts 1078 (Appx1793).  FMFADA was to "formulat[e] a reuse plan for Fort Monroe."  2007 Va. Acts 1079 (Appx1794).  By May 2007, the Army had announced publicly that it expected to divest itself of at least some of the property at the Fort Monroe Site in 2012.  *Id.* ¶ 34.

In August 2008, FMFADA released a formal Fort Monroe reuse plan, which described in broad terms the manner in which the Fort Monroe Site would be developed after large portions of the property reverted to the Commonwealth of Virginia.  DPFUF ¶ 35.  The plan called for maintaining the "historic center" of Fort Monroe as a "'Mixed-Use/Visitor & Cultural Focus'" area, while developing other portions of the site for residential and commercial use.  *Id.*  By mid-

2008, representatives of the Army, FMFADA, and Dominion had begun to meet to discuss the effects of terminating the privatization contract in light of the pending closure of Fort Monroe and the transfer of Fort Monroe real property to Virginia.  *Id.* ¶ 36.

**B.    The Air Force Announces The Planned Termination Of CLIN 0007; Virginia Creates The Fort Monroe Authority; And Dominion Presents Post-Termination "Options"**

By January 2011, the Air Force had been tasked with administering the privatization contract.  DPFUF ¶ 37.  On January 27, 2011, an Air Force contracting officer sent Dominion a memorandum with the subject line "Operation and Maintenance Contract SP0600-04-C-8253 Partial Termination for Convenience of the Government."  *Id.* ¶ 38.  Dominion was informed that Fort Monroe would close on September 15, 2011, and that, "[i]n accordance with Federal Acquisition Regulation clause 52.249-2 – Termination for Convenience of the Government (Fixed-Price), contract line item number 0007 for the Privatization of Fort Monroe, Virginia Electric Distribution System is hereby terminated for convenience effective 15 September 2011." *Id.* ¶ 39.  The Air Force requested that Dominion "submit a termination settlement proposal no later than 28 March 2011."  *Id.* ¶ 40.

On March 25, 2011, respresentatives of Dominion met with representatives of the Army and the Air Force.  DPFUF ¶ 41.  A Dominion representative informed the Government personnel present "that the Notice of Termination that [Dominion] received was not sufficient because it did not clearly state the Government's desire upon termination."  *Id.*  Dominion also stated that, in Dominion's view, there were "three options available" with respect to the treatment of the Fort Monroe electrical distribution system after termination of the privatization contract: the Government could "reacquir[e] the system"; the Government could "ask[] Dominion to continue ownership," and Dominion could "agree[] to integrate [the system] into

our regulated system"; or the Government could "ask Dominion to continue ownership and [Dominion] do[es] not want the system which would" – according to Dominion – "result in Government paying for cost of removal minus salvage." *Id.* ¶ 42.  Dominion's representatives asserted, as well, that "the easement that is associated with the Privatization Contract expires upon termination." *Id.* ¶ 43.

The following day, March 26, 2011, the General Assembly of Virginia passed the Fort Monroe Authority Act, which created "as a public body corporate and as a political subdivision of the Commonwealth" the Fort Monroe Authority (FMA), an entity that replaced and succeeded to all the interests of the FMFADA.  DPFUF ¶ 44; *see* Fort Monroe Authority Act, 2011 Va. Acts 1180-86 (Appx1795-1801).  The FMA was empowered and obligated to "oversee the preservation, conservation, protection, and maintenance of the Commonwealth's natural resources and real property interests at Fort Monroe and the renewal of Fort Monroe as a vibrant and thriving community." *Id.* at 1182 (Appx1797).  In addition, the FMA Act specifically authorized the FMA "[t]o enter into privatized agreements with any public utility for the provisions of services at Fort Monroe," *id.* at 1185 (Appx1800) and, more generally, "[t]o enter into any contracts not otherwise specifically authorized in this article to further the purposes of the Authority." *Id.* at 1184 (Appx1799).

On March 31, 2011 – a few days after passage of the FMA Act – representatives of Dominion met with representatives of the FMA.  DPFUF ¶ 45.  Dominion's representatives told the FMA personnel at the meeting that there were "[t]hree available options" for treatment of the electric distribution system at Fort Monroe after termination of the privatization contract. *Id.* ¶ 46.  The first option was for the Army to reacquire the distribution system and convey it to the Commonwealth of Virginia along with the real property from Fort Monroe, *id.* ¶ 47 – a

possibility that did not much interest the FMA's representatives because they did not want the FMA to be responsible for operating the electrical utility system at the Fort Monroe Site. *Id.* ¶ 48.

The second option presented by Dominion was for Dominion to continue to own the system and to enter into a contract with the FMA for the operation and maintenance of the system. DPFUF ¶ 50. The third option, described as a "last resort," was for Dominion to continue to own the system and to remove it entirely so that it could be replaced with a system that would "be what Dominion would have installed if Fort Monroe were a new development." *Id.* ¶ 51.

The FMA's representatives preferred the second option, and anticipated that, after the closure of the base and the termination of the Army's privatization contract with Dominion, the FMA would take the Army's place as party to a similar contract with Dominion for electric distribution service. DPFUF ¶ 51. That contract, according to the FMA's plans in or about 2011, would be an "interim" arrangement, maintained so that electricity could be provided to the Fort Monroe Site for at least several years after the initial transfer of the property from the Army. *Id.* ¶ 52. The FMA's management anticipated that this interim agreement would provide "for not only the provision of electric services but any necessary upgrades/repairs that would be" necessary before the FMA was "able to move to a fully regulated agreement" – that is, an agreement entered after meters were installed at individual buildings within the Fort Monroe Site, and the tenants occupying those buildings "establish[ed] accounts" with Dominion directly. *Id.* Anticipating that some upgrades to the electrical infrastructure at Fort Monroe would be necessary before the Fort Monroe Site could "move towards a regulated [utility] system," the

FMA's management planned to obtain electrical services through the contemplated "interim" contractual arrangement with Dominion while those upgrades were made.  *Id.* ¶ 53.

C.     **The Air Force Issues A Revised Termination Notice, And Dominion Submits Its Termination Settlement Proposal, Which Includes No Claim For Upgrade Expenses**

After Dominion representatives asserted that the Air Force's January 27, 2011 termination notice was "not sufficient because it did not clearly state the Government's desire upon termination," DPFUF ¶ 41, the Air Force contracting officer issued a revised notice on June 3, 2011.  *Id.* ¶ 54.  This notice, too, stated: "In accordance with Federal Acquisition Regulation clause 52.249-2 – Termination for Convenience of the Government (Fixed-Price), contract line item number 0007 for the Privatization of Fort Monroe, Virginia Electric Distribution System is hereby terminated for convenience effective 15 September 2011."  *Id.*  But additional language was added:

> The Army desires DVP to continue ownership of the electrical distribution system at Fort Monroe after termination effective date. While the Army continues to own the property it will continue to provide DVP with a standard utility easement for future access to the distribution system.  The Army believes these easements will be conveyed with the land and be further granted by the Fort Monroe Authority or any other future property owner as a requirement in the terms of the conveyance from the Army.

*Id.* ¶ 55.  The Air Force requested that a termination settlement proposal be submitted by Dominion on or before August 2, 2011.  *Id.* ¶ 56.

On August 2, 2011, Dominion employee Paul Matthews submitted to the Air Force a two-page document titled "Termination Settlement Proposal."  DPFUF ¶ 57.  In that proposal, Dominion stated that it expected the partial contract termination to occur on September 15, 2011; that it understood that "the Army desires Dominion Virginia Power to continue ownership of the electrical distribution system at Fort Monroe after the termination effective date"; and that it

12

assumed "that either the U.S. Army or another entity will require electrical service from Dominion Virginia Power utilizing the electrical facilities that are included in this termination after termination on September 15, 2011." *Id.* ¶ 58.

Dominion also asserted that "[t]he Termination Settlement Value owed by the Government to Dominion at termination will be $3,687,602.93." DPFUF ¶ 59. The manner in which that "Settlement Value" was calculated was not disclosed in the proposal. *Id.* Dominion did acknowledge that it would not yet have paid in full the purchase price of the Fort Monroe electrical distribution system by September 15, 2011, and so subtracted the amount of that price that would remain unpaid as of that date from the "Termination Settlement Value." *Id.* ¶ 60. Dominion also reduced the "Settlement Value" by a small amount to account for Government funds Dominion had retained to cover possible adverse tax consequences that had never materialized. *Id.* After those adjustments, the sum that Dominion asked to be paid as a termination settlement was $1,883,333.94. *Id.* Dominion did not mention in its proposal the installation of additional meters at the Fort Monroe Site, nor did it mention upgrades to the Site's street lighting or distribution system. *Id.* ¶ 61.

**IV.**     **Post-Termination: Dominion Provides Electric Service To The Fort Monroe Site Pursuant To A New Contractual Arrangement, And Submits A Series Of Termination Settlement Demands**

    **A.**     **The Army And Dominion Execute A New Agreement To Provide For Continued Service To The Master Meter At The Fort Monroe Site**

As of September 15, 2011 – the effective date of the termination of CLIN 0007 under the privatization contract – no property from the Fort Monroe Site had been conveyed to Virginia. DPFUF ¶ 63. Dominion's last invoice for services provided to Fort Monroe pursuant to the privatization contract covered the performance period from August 16, 2011, to September 15, 2011. *Id.* ¶ 64.

On October 24, 2011, representatives of Dominion and the Army Contracting Command at Rock Island executed a document called an "AUTHORIZATION FOR ELECTRIC SERVICE" (Authorization).  DPFUF ¶ 65.  Pursuant to that document, Dominion and the Army agreed that Dominion would provide services to the Fort Monroe Site pursuant to Contract No. GS-00P-08-BSD-0560 (Areawide Contract), an areawide public utility contract between the United States, acting through the General Services Administration (GSA), and Dominion.  *Id.* ¶¶ 66-67.

A "master contract" issued "to cover the utility service acquisitions of all Federal agencies in the franchised certificated service territory from [Dominion]," the Areawide Contract was executed on August 22, 2008, by a Dominion vice president and a contracting officer from the GSA Energy Center of Expertise.  DPFUF ¶¶ 68, 71.  The contract allowed an "'Ordering Agency'" to "enter[] into a bilaterally executed Authorization for procurement of Electric and/or energy management services."  *Id.* ¶ 69(a).  The Authorization served as "an order form to acquire services under th[e] Areawide Contract."  *Id.* ¶ 69(b).  By executing an Authorization, Dominion "agree[d] to furnish to the Ordering Agency, and the Ordering Agency agree[d] to purchase from [Dominion], the above noted services for the installation(s) or facility(ies) named in the Authorization pursuant to the terms of th[e] Areawide Contract."  *Id.* ¶ 69(h).

The Areawide Contract defined the "term 'Contractor's Tariff,'" in relevant part, to mean "the terms and conditions applicable to similarly situated jurisdictional customers."  DPFUF ¶ 69(d).  If services named in an executed Authorization were available through Dominion's tariff, then the tariff applied to the provision of those services.  *Id.* ¶¶ 69(i).  If an Authorization provided for the acquisition of services that were not available through the tariff, then the services would be rendered pursuant to the terms and conditions agreed to by Dominion and the

14

Ordering Agency.  *See id.* ¶ 69(d), (i), (j).  The Areawide Contract required that "[m]etering equipment of standard manufacture suitable to measure all utility services supplied by the Contractor hereunder . . . be furnished, installed, calibrated and maintained by [Dominion] at its expense."  *Id.* ¶ 69(k).

Pursuant to the Authorization executed by Dominion and the Rock Island Contracting Command on October 24, 2011, Dominion agreed to provide "Continue[d] Service" and "Special Facilities" to the Fort Monroe Site, effective September 15, 2011, and continuing "until notified by Customer."  DPFUF ¶ 72.  Part of the service to be provided was "[s]ervice through one 7.5 mVA transformer to multiple delivery points with primary metering at 13.2 kV" "instead of" "[s]ervice through two 2800 kVa transformers . . . with totalized secondary metering."  *Id.* ¶ 73. In other words, Dominion would measure the amount of electricity delivered to the Fort Monroe Site for billing purposes using one "primary" or "master" meter located at a 13.2 kV delivery point, *id.* ¶ 74, just as it had done prior to the partial termination of the privatization contract. *See id.* ¶ 6(d).  For this arrangement, which was described in the Authorization as "facilities supplied in addition to those normally provided," the Army agreed to pay a "monthly facilities charge" of $54,655.77.  *Id.* ¶¶ 75-76.  In addition to that amount, the Army would make a further payment every month for each kilowatt-hour of electricity supplied and delivered to the Fort Monroe master meter.  *Id.* ¶ 77.

### B.    Dominion Repeatedly Revises Its Termination Settlement Proposal

On March 7, 2012, contracting officer Cynthia Lewandowski sent Dominion a letter in which she rejected Dominion's August 2, 2011 termination settlement proposal as insufficiently supported.  DPFUF ¶ 79.  She asked that Dominion resubmit the proposal "us[ing] the appropriate form for the type of settlement proposal that you are submitting."  *Id.*

Paul Matthews of Dominion submitted a letter in response on June 29, 2012.  DPFUF ¶ 80.  He asserted that the Government had two options: either pay Dominion $30,000,000 to "remove[]" the Fort Monroe electrical distribution system, or "pay[] the cost to bring the System up to current residential, commercial and regulatory standards."  *Id.* ¶ 80(e)-(f). According to Mr. Matthews, the termination of the privatization contract's CLIN 0007 on September 15, 2011 "prematurely forced DVP to take the non-conforming System into a residential and commercial setting and to continue providing electrical power to the current users.  As such, the System does not meet current residential, commercial, or regulatory standards with regard to . . . individual unit metering, distribution and street lighting."  *Id.* ¶ 80(b).  Also according to Mr. Matthews, "[p]ursant to Section H.9 of the Solicitation [for the privatization contract], the Government is responsible" for funding any upgrades to the metering, distribution system, and street lighting that Dominion deemed necessary – at a cost that Mr. Matthews claimed was $9,872,069.  *Id.* ¶ 80(e).

On October 30, 2013, before the Air Force had issued a formal response to the June 29, 2012 proposal, Mr. Matthews sent another letter to Ms. Lewandowski.  DPFUF ¶ 82. Proclaiming that the privatization contract had "required Dominion to upgrade Fort Monroe's electric power distribution system . . . over the term of the Contract to become compliant with all applicable legal and regulatory requirements," and also required the Government "to reimburse Dominion for the costs of such upgrades," he asserted that the Government terminated CLIN 0007 "prior to having paid Dominion for the System upgrade costs while knowing that the System still needed to be upgraded."  *Id.* ¶ 82(b)-(c).  Accordingly, he continued, "Dominion hereby files this claim for the Government to pay Dominion $9,886,951.37 for the costs to upgrade the System."  *Id.* ¶ 82(d).

Ms. Lewandowski rejected the October 30, 2013 claim as "premature" in December 2013.  DPFUF ¶ 84.  On March 7, 2014, she sent Mr. Matthews a letter largely rejecting Dominion's June 29, 2012 proposal, concluding, among other things, that "[c]osts associated with bringing the distribution system up to commercial standards after termination are not recoverable termination costs."  *Id.* ¶¶ 85-86.  She also pointed out that "[t]he announcement of the partial termination to DVP was the stopping point for responsibility for future plans regarding all assets sold to DVP."  *Id.* ¶ 87.  While rejecting almost all of Dominion's theories of recovery, she did decide that Dominion was entitled to "$24,190, for legal fees."  *Id.* ¶ 89(b).  She continued, "You are advised that this is the contracting officer's final decision from which DVP may appeal under the Disputes clause."  *Id.*

After the issuance of that decision, Ms. Lewandowski was replaced as the contracting officer for the privatization contract by Captain Cindy Baker.  DPFUF ¶ 91.  At the request of Dominion's counsel, Captain Baker "agree[d] to a 60-day re-engagement with DVP," subject to enumerated conditions.  *Id.* ¶¶ 90-91.  On August 18, 2014 – 73 days later – Dominion submitted a new version of its termination settlement proposal.  *Id.* ¶ 92.  In this version, Dominion asserted entitlement to "a total of $13,472,418," based upon two theories.  *Id.*  First, Dominion contended that it was entitled to $2,384,663 as "reimbursement" of "DVP's unrecovered costs incurred and investments made, due to the Contract terminating 43 years early."  *Id.* ¶ 92(b).  Dominion had computed the $2,384,663 figure by (1) "accumulat[ing] all DVP's incurred costs from Contract award until the date of termination on the four components of the [Fort Monroe privatization] project"; adding "a reasonable profit" to the resulting sum of those costs; and subtracting "Applicable Credits and Contract Payments."  *Id.* ¶ 93(c).  Dominion treated the

entire purchase price of the distribution system as a cost it was entitled to recover as part of the termination settlement.  *Id.*

Second, Dominion asserted that it was entitled to recover from the Government the estimated cost of "bringing" Fort Monroe's metering, street lighting, and distribution "systems up to regulatory standards."  DPFUF ¶ 92(d).  This was so, according to Dominion, because "the claimed costs for ML&D system upgrades are costs that flow from and are associated with the termination, and fairness requires government payment for the costs."  *Id.*  Dominion also asserted that the Government was required by 48 C.F.R. § 31.205-42(b) to pay those costs, which Dominion characterized as "continuing costs," and which, by Dominion's estimation, equaled $13,250,688.44.  *Id.* ¶ 92(d), (f)-(h).  That number, plus $2,384,663 in claimed "[u]nrecovered costs," plus $226,272 in "[t]ermination settlement costs," less a "[r]evenue credit" of $2,389,206, yielded a total claimed settlement amount of $13,472,418.  *Id.* ¶ 92(i).

## C.    Dominion Submits Successive Certified Claims And Pursues One Before The Board of Contract Appeals

On October 16, 2015, before the contracting officer had issued a decision regarding the August 18, 2014 settlement proposal, Mr. Matthews sent her a letter characterized as, "Contract Disputes Act Claim Under DLA Contract No. SP0600-04-C-8253 – Reimbursement for Unrecovered Investment Costs and Determination on Utility System Ownership."  DPFUF ¶ 93.  Describing the letter as a "Request for Contracting Officer's Final Decision," Mr. Matthews stated that the claim presented was "limited to (1) the Net Unrecovered Investment element of DVP's [August 18, 2014 termination settlement proposal]; and (2) the ownership of the utility system and the status of the Promissory Note dated December 15, 2004."  *Id.* ¶ 94(a).  He indicated that Dominion's request for "Metering, Lighting and Distribution System costs" would "be the subject of a separate Request for Contracting Officer's Final Decision."  *Id.* ¶ 94(b).  As

"Net Unrecovered Investment," he claimed Dominion was entitled to $1,666,850, said to constitute "payment for unreimbursed capital improvements and costs of performance made over the course of the [privatization] Contract." *Id.* ¶ 94(a), (c)-(d).  Mr. Matthews also "request[ed] a Final Contracting Officer's Decision on the government's position on ownership of the [Fort Monroe distribution] system." *Id.* ¶ 94(f).  Finally, he certified the claim. *Id.* ¶ 94(g).

Approximately three months later, on January 21, 2016, Dominion filed a complaint before the Armed Services Board of Contract Appeals (ASBCA), stating that it was treating the Air Force's failure to issue a decision on the October 16, 2015 claim as a "deemed denial." DPFUF ¶¶ 95-96(a).  Dominion asserted in its complaint that it was entitled to $1,837,469 "for payment of its allowable costs and termination expenses incurred for the unrecovered investment (incurred cost) element of its" termination settlement proposal. *Id.* ¶ 96(b).  In a separate count, titled "DEFECTIVE TERMINATION," Dominion contended that the Air Force, in stating in its June 3, 2011 termination notice that it "desired that [Dominion] retain ownership of the [distribution] system," was requesting a "transfer of system ownership." *Id.* ¶ 96(c).  According to Dominion, the Air Force's "use of [the] precatory 'desire' convention in the Termination Notice, and failure to act on the Promissory Note, Bill of Sale and Easement agreement renders the termination defective until such time as agreed terms and conditions on the termination are reached with" Dominion. *Id.* ¶ 96(f).  Dominion asked that the board enter judgment to that effect. *Id.*

Approximately two weeks later, on February 5, 2016, Mr. Matthews submitted a second certified claim to the Air Force, this time in the form of a letter with the subject line, "Request for Final Contracting Officer's Decision Under DLA Contract No. SP0600-04-C-8253 – Costs Continuing After Termination for Bringing Metering, Lighting and Distribution Systems up to

Regulated Standards." DPFUF ¶ 100. In this claim, Dominion contended that it was entitled to:

$1,651,484, as the estimated cost Dominion would allegedly incur if it installed a meter "for each

of the 370 service points inside" the Fort Monroe Site, *id.* ¶ 101(b)-(c); $4,013,556, as the

estimated cost Dominion would allegedly incur if it replaced the existing street light "fixtures

and poles" at the Fort Monroe Site with "sodium vapor fixtures and poles," *id.* ¶ 101(d)-(e);

$7,669,460, as the estimated cost Dominion would allegedly incur if it made "improvements" to

the Fort Monroe distribution system that included "installing high ampacity cables and switches

from the substations, and reconnecting the existing URD primary cables to the added switches to

create the primary cable system" assertedly "required by" Dominion's "design standards," *id.*

¶ 101(f)-(g); and $165,135, as "Settlement Expenses" incurred by Dominion for the preparation

of its termination settlement proposal. *Id.* ¶ 101(h). Mr. Matthews then certified the claim. *Id.*

¶ 101(i).

### D.   The Air Force Denies The Claim For Upgrade Expenses, But Settles Dominion's Board Appeal For $1.5 Million

The Air Force contracting officer largely denied Dominion's February 5, 2016 claim for

upgrade expenses in a final decision issued on April 5, 2016. DPFUF ¶ 102. Although she

rejected the proposition that the Air Force was required to pay for future upgrades to the Fort

Monroe distribution system, she agreed to pay certain termination settlement costs claimed by

Dominion. *Id.* ¶¶ 103-04.

On September 1, 2016, authorized representatives of Dominion and the Government

jointly executed a settlement agreement (NUI settlement) that resolved Dominion's claim for its

so-called "Net Unrecovered Investment" (NUI) in the Fort Monroe distribution system. DPFUF

¶ 97. The agreement specified that it did not resolve Dominion's claim for costs associated with

upgrading Fort Monroe's "Metering, Lighting and Distribution Systems," referred to as the

20

"MLD Component" of Dominion's claims.  *Id.* ¶ 98.  Pursuant to the settlement, the Government

agreed to pay Dominion $1,543,694.00 to resolve the NUI claim, as well as Dominion's claim

for "Settlement Costs" incurred in preparing both its NUI and its MLD termination settlement

proposals.  *Id.* ¶ 99.

## V.      Post-Termination: While Dominion Pursues Its Claims, The Army Transfers Large Portions Of The Fort Monroe Site To Virginia, And The FMA Reimburses The Army For The Service Provided By Dominion Under The Areawide Contract

After the closure of the military installation at Fort Monroe in September 2011,

Dominion continued to send the Army the monthly invoice for the electricity delivered to the

Fort Monroe master meter.  DPFUF ¶ 116.  Each month, the Army forwarded Dominion's

invoice to the FMA, which then reimbursed the Army for the cost of electric service provided to

FMA-managed property at the Fort Monroe Site.  *Id.* ¶ 117.

On May 31, 2013, an authorized representative of the United States executed a quitclaim

deed conveying approximately 312 acres from the Fort Monroe Site to the Commonwealth of

Virginia.  DPFUF ¶ 105.  The deed was executed by the Governor of Virginia on June 4, 2013,

and recorded in the Circuit Court Clerk's Office in Hampton, Virginia, on June 14, 2013.  *Id.*

¶¶ 106-07.  The Army's conveyance of the deeded property to the Commonwealth was made

"SUBJECT TO all valid and existing restrictions, reservations, covenants, conditions, and

easements, including but not limited to rights-of-way for railroads, highways, pipelines, and

public utilities, if any, whether of public record or not."  *Id.* ¶ 108(b).

A document entitled a "MEMORANDUM OF UNDERSTANDING" was filed in the

Circuit Court Clerk's Office with the deed.  DPFUF ¶ 109.  Executed by representatives of the

United States, the Commonwealth of Virginia, and the FMA, the memorandum provided:

> The Army currently manages the utility systems at Fort Monroe for
> the benefit of all users.  The Army has service agreements with

> utility service providers and receives and pays the bills from those
> providers.  In turn, the Army bills other users, including the FMA,
> for their pro-rata share of utility usage.  Because the majority of
> the utility system assets and users occupy reversionary property,
> upon reversion of the reversionary property the Parties mutually
> intend that the FMA will begin to manage the utility systems at
> Fort Monroe for the benefit of all users, i.e., the FMA will enter
> into service agreements with utility service providers, receive and
> pay bills from those providers, and bill the Army and other users
> for their pro-rata share of utility usage.

*Id.* ¶ 110-11.  With respect to the electrical utility system at Fort Monroe, however, the

memorandum stated:

> The [Fort Monroe] electric system is owned by Dominion Virginia
> Power ("Dominion").  Dominion has made a claim against the
> Army because of the Army's termination of its maintenance
> contract with Dominion.  That claim is pending before a hearing
> officer at Langley.  To assist in an orderly transition, the Army has
> indicated a willingness to maintain its service contract with
> Dominion and continue to receive and process electricity bills after
> the transfer of the 312 acres (and any other transfers), for a period
> of up to 90 days, or until Dominion is legally obligated to provide
> service to FMA, whichever occurs later. . . .

*Id.* ¶ 112.

Several additional property transfers occurred in the following years.  In 2015, Virginia

reconveyed approximately 100 acres at the Fort Monroe Site to the Department of the Interior for

management as a national monument.  DPFUF ¶ 113.  In April 2017, the Government conveyed

approximately 80 additional acres from the Fort Monroe Site to Virginia.  *Id.* ¶ 114.  Finally, in

December 2018 and March 2019, the Government conveyed approximately 14 additional acres

to the FMA and the Commonwealth of Virginia.  *Id.* ¶ 115.

Dominion personnel have informed FMA officials that, until the company's efforts to

obtain a satisfactory settlement from the Government have concluded, Dominion will not agree

to enter into a service agreement with the FMA for the provision of electric utility service to the

Fort Monroe Site. DPFUF ¶ 122. In the meantime, Dominion continues to send its monthly bills for the Fort Monroe Site to the Army, and the FMA has continued to reimburse the Army for the share of the bill attributable to electricity usage on state-owned or -managed property. DPFUF ¶¶ 116-17. For the period from August 20, 2018, to September 19, 2018, Dominion billed the Army $180,031.74 for electric service to the Fort Monroe Site. *Id.* ¶ 119. As of October 2018, the portion of the monthly Dominion electric bill for which the FMA did *not* reimburse the Army was "in the neighborhood of" $2,800. *Id.* ¶ 118.

As of October 23, 2018 – the date on which the Government took Dominion's deposition pursuant to RCFC 30(b)(6) in this matter – Dominion had not expended any funds on "field labor to actually do the work" of making the upgrades to Fort Monroe's metering, lighting, and distribution system for which Dominion seeks "costs" in this litigation. DPFUF ¶ 120.

Prior to March or April of 2018, Dominion had not incurred *any* costs in connection with the upgrades it asserts must be made to Fort Monroe's metering, lighting, and distribution system, other than costs incurred in developing Dominion's termination settlement proposal. DPFUF ¶ 121. Dominion itself asserts that, as of September 5, 2019, the company has actually incurred approximately $240,000 of the approximately $10 million in "costs" it seeks in this matter. Matthews Decl., ECF No. 81-3, ¶ 47.

## VI.    The Allegations Of Dominion's Amended Complaint

According to Dominion's amended complaint, as of May 31, 2013 – when the Government first conveyed a portion of the Fort Monroe Site to Virginia – the use of a "master meter" to bill for electricity delivered to the Site "was not permitted." Am. Compl., ECF No. 22, ¶¶ 17-19. This is so, again according to Dominion, because unspecified "[r]egulated standards required an individual service at every building, approximately 224 new meter installations." *Id.*

¶ 19.  Therefore, by Dominion's reasoning, the Government is required to pay for Dominion to install those "new meter installations."  *Id.*

Dominion also alleges that the Government must pay for Dominion to renovate the Fort Monroe "lighting system" by "using multiple circuits, multiple power supplies, and sodium lights."  Am. Compl. ¶ 22.  This is so because, according to Dominion, these changes to the lighting system became "legally required post[-]contract termination."  *Id.* at 8 (Figure 5) (capitalization altered).

Finally, Dominion alleges that the Government must pay for Dominion to install "additional switches, more feeder cables and fewer transformers in each series circuit" in the Fort Monroe electrical distribution system.  Am. Compl. ¶ 24.  This is so, according to Dominion, because the existing distribution system does not "comply with" unspecified "regulated standards required in Dominion's Tariff."  *Id.* ¶ 25.

Dominion does not actually specify in its complaint the amount of "costs" that it seeks in this action, but admits that it demanded a sum certain of $13,499,634.69 in its February 5, 2016 certified claim.  Am. Compl. ¶ 101.  In this brief, we refer to the amounts sought by Dominion in this litigation as "upgrade expenses."

## ARGUMENT

Dominion's position in this litigation appears to be predicated on the notion that the Government's termination of CLIN 0007 under the privatization contract created an opportunity for Dominion to renegotiate the terms of its acquisition of the Fort Monroe distribution system.  That is not the case.  A standard clause incorporated by reference into the privatization contract delineates clearly the categories of contractor costs that must be reimbursed in connection with a termination for convenience – and the upgrade expenses to which Dominion claims entitlement

in this litigation fall into none of those categories.  Consequently, the Government is not liable

for them.  The Government is also not liable for those costs because they are not allocable to the

privatization contract.  The Government is therefore entitled to the entry of judgment in its favor

as to Counts I, II, and IV of the amended complaint.

In its own motion for summary judgment, Dominion makes no reference to Count III of

its complaint, entitled "Defective Termination," Am. Compl. ¶¶ 129-37  – perhaps because there

exists no cause of action for "defective termination," and the assertions made under that heading

in Dominion's complaint are illogical, conclusory, and lacking any apparent legal or factual

basis.  For all of those reasons, judgment should be entered in favor of the United States as to

Count III.

Although Dominion's operative complaint contains only four counts, Dominion attempts

to assert a fifth in its dispositive motion, proclaiming for the first time that "the partial

termination of CLIN 007 functioned as a *change* to the Contract and CLIN 007."  Pl.'s Mot. 34.

Supposedly, under this theory, the Government's termination of CLIN 0007 was only "partial"

because it "did not terminate . . . that portion of CLIN 007 that conveyed ownership of the

electric system to Dominion."  *Id.*  This allegedly partial termination of the CLIN caused

"increased costs of [system] ownership" for Dominion, which, according to Dominion, the

Government is obligated to pay.

This theory asserts entitlement to an equitable adjustment on the ground that the partial

termination effected a change in the continued portion of the contract.  That claim is not pled in

Dominion's complaint, nor was it presented to the Air Force contracting officer.  As a result,

Dominion may not assert it now.  Even if that were not the case, the claim would be doomed to

failure.  Dominion cannot demonstrate that CLIN 0007 was only partially terminated, or that

Dominion has a continuing obligation under the privatization contract to maintain ownership of the Fort Monroe distribution system.  Furthermore, if Dominion wanted to bring a claim for an equitable adjustment based upon the termination of CLIN 0007, it was required by the termination-for-convenience clause to do so within 90 days of the date of termination.  48 C.F.R. § 52.249-2(l) (2001).  Dominion failed to do so.  For all of those reasons, Dominion's new equitable-adjustment theory cannot prevent the entry of judgment in favor of the Government.

Judgment should be entered in favor of the Government as to all counts of Dominion's complaint for the reasons already outlined, without any need for the Court to wade into the tangle of irrelevant expert opinions, conclusory assertions, and erroneous legal theories that constitute Dominion's arguments concerning the asserted relationship between the partial termination of the privatization contract and Dominion's supposed obligation to make extensive upgrades to the Fort Monroe distribution system.  To assist the Court in the event that it does wish to delve into that matter, however, we conclude this motion by analyzing Dominion's arguments on the subject, and demonstrating that they lack any legitimate basis in law or fact.

## I.      Standard Of Review

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  "Material" facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Only a *genuine* dispute as to a material fact may prevent the grant of summary judgment.  RCFC 56(a).  A dispute qualifies as "genuine" if "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

II.   **Summary Judgment Should Be Granted In Favor Of The United States As To Counts I, II, And IV**

Counts I, II, and IV of Dominion's amended complaint all rest upon essentially the same legal theory: that the Government was obligated to pay Dominion its claimed upgrade expenses as part of a termination settlement pursuant to 48 C.F.R. § 52.249-2, the termination-for-convenience clause (termination clause) incorporated into the privatization contract.  In Count I, Dominion asserts that its upgrade expenses "are costs that flow from the termination and are thus allowable costs continuing after termination within the meaning of FAR § 31.205-42(b)."  Am. Compl. ¶ 122.  In Count II, Dominion contends that "[f]airness requires that the Government take full financial responsibility for" supposedly "triggering the regulatory obligation and costs to bring the MLD systems up to regulated standards."  *Id.*  ¶ 126.  And in Count IV, Dominion argues that the Government "breached the Contract" by allegedly failing to comply with "FAR § 31.205-42(b) and FAR § 49.201."  *Id.* ¶¶ 139-40.  Because the Government, in fact, has no legal obligation to pay Dominion's upgrade expenses as part of a termination settlement, all three counts lack merit, and judgment as to those counts should be entered in favor of the Government.

A.   **Dominion Cannot Prevail On Its Claims Because The Government Is Not Obligated By The Termination Clause To Pay Upgrade Expenses**

The termination clause included in the privatization contract controls the types of payments, if any, that must be made by the Government to Dominion in connection with a termination for convenience.  *See, e.g.*, *Emeco Indus., Inc. v. United States*, 202 Ct. Cl. 1006, 1019 (1973) ("[I]n contracts . . . which contain a termination for convenience article, recovery must be calculated in accordance with that article . . . .").[1]  Under the standard termination clause

---

[1]  Dominion's discussion of the legal standards supposedly applicable in connection with a termination-for-convenience suffers from significant oversimplification.  *See* Pl.'s Mot. 18-21. For example, Dominion asserts that "the 'only substantial difference between the sums

incorporated by reference into the privatization contract, "[i]f the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the contractor the amounts determined by the Contracting Officer as follows":

> (1)  The contract price for completed supplies or services accepted by the Government (or sold or acquired under subparagraph (b)(9) of this clause) not previously paid for, adjusted for any saving of freight and other charges.
>
> (2)  The total of—
>
>    (i)  The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to supplies or services paid or to be paid under subparagraph (g)(1) of this clause;
>
>    (ii)  The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (g)(2)(1) of this clause; and
>
>    (iii)  A sum, as profit on subdivision (g)(2)(i) of this clause, determined by the Contracting Officer . . . .

---

recoverable by a contractor under a convenience termination provision . . . and the sums recoverable in a common-law action for [a] contract breach is the non-inclusion in the former of anticipated but unearned profits." Pl.'s Mot. 18-19 (quoting *SWR, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35832 (2014)).  To the extent Dominion means to suggest by that reference that it may recover upon a termination for convenience any amount it could have for a breach of contract, so long as that amount does not include anticipatory profits, that suggestion is contradicted by numerous binding authorities, including the text of the termination clause. *See also* 48 C.F.R. § 49.202(a) (prohibiting the payment of "consequential damages" as part of a termination-for-convenience settlement); *Manloading & Mgmt. Assocs., Inc. v. United States*, 198 Ct. Cl. 628, 636 (1972) ("[P]laintiff is entitled to recover only in accordance with the 'Termination for Convenience' clause, and not as if a common law breach of contract had occurred.").

Dominion also mischaracterizes the nature of a termination-for-convenience settlement in suggesting that a convenience termination "converts a fixed-price contract into a cost-reimbursable contract." Pl.'s Mot. 18.  Unlike amounts payable under a cost-reimbursement contract, termination settlements are subject to loss adjustment. *See* 48 C.F.R. §§ 49.203, 52.249-2(f)(2)(iii).

(3)  The reasonable costs of settlement of the work terminated, including—

(i)  Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii)  The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(iii)  Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

48 C.F.R. § 52.249-2(g)(1)-(3) (2001).

Dominion's claimed upgrade expenses fall into none of those categories of costs the Government must pay.  The "terminated work" in this case is all work to be provided pursuant to CLIN 0007 of the privatization contract on or after September 15, 2011.  *See* DPFUF ¶¶ 38-39, 54.  Each "contract line item number[]" in the privatization contract "represent[ed] the utility system included in th[e] contract for privatization and the resultant 50-year service."  *Id.* ¶ 10(c).  Thus, each CLIN included two sub-CLINs: CLIN AA, for "utility service," and CLIN AB, for "Monthly Credit as Payment for [the] Purchase Price" of the utility system.  *Id.* ¶ 16.  When the Government terminated CLIN 0007 effective September 15, 2011, it eliminated, as of September 15, 2011, any further obligation by Dominion to provide "utility service" to Fort Monroe under the privatization contract; that was the "terminated work."

Plainly, Dominion's claimed upgrade expenses are not "costs incurred in the performance of the work terminated," 48 C.F.R. § 52.249-2(g)(2)(i); Dominion did not provide – and was not authorized to provide – any utility service to Fort Monroe pursuant to the privatization contract on or after September 15, 2011, *see* DPFUF ¶¶ 54, 64, and, indeed, Dominion asserts that the

29

upgrades in question would never have been performed *at all* under CLIN 0007.  *See* Pl.'s

Statement of Facts (SOF), ECF No. 81-2, ¶ 64.

Just as clearly, the upgrade expenses claimed by Dominion are not "the contract price for

completed supplies or services accepted by the Government."  48 C.F.R. § 52.249-2(g)(1).

Dominion has already settled its claim for all costs associated with services rendered prior to the

termination, *see* DPFUF ¶¶ 94(c)-(e), 96(b), 97, and, further, the upgrades cannot be

characterized as "completed supplies or services accepted by the Government," because, as of

2018 – seven years after the termination – Dominion had not implemented any of them.  DPFUF

¶¶ 120-21.

For obvious reasons, the upgrade expenses do not constitute a "cost of settling and paying

termination settlement proposals under terminated subcontracts," nor are they "profit" on "costs

incurred in the performance of the work terminated."  48 C.F.R. § 52.249-2(2)(ii)-(iii).  They are

not "[a]ccounting, legal, and other expenses reasonably necessary for the preparation of

termination settlement proposals," *id.* § 52.249-2(g)(3)(i) – and Dominion has, in any event,

already settled its claim for settlement costs associated with its upgrade claim.  DPFUF ¶ 99.

The expenses are not costs associated with "[t]he termination and settlement of subcontracts."

48 C.F.R. § 52.249-2(g)(3)(ii).

Finally, the upgrade expenses are not "[s]torage, transportation, [or] other costs incurred,

reasonably necessary for the preservation, protection, or disposition of the termination

inventory," 48 C.F.R. § 52.249-2(g)(3)(iii), for at least two fundamental reasons.  First, the Fort

Monroe distribution system was not "termination inventory," which is defined by the FAR as:

> [A]ny property purchased, supplied, manufactured, furnished, or
> otherwise acquired for the performance of a contract subsequently
> terminated and properly allocable to the terminated portion of the
> contract.  It includes Government-furnished property.  It does not

include any facilities, material, special test equipment, or special
tooling that are subject to a separate contract or to a special
contract requirement governing their use or disposition.

48 C.F.R. § 2.101.  The distribution system fails on multiple levels to fit that definition.  It is not

"properly allocable to the terminated portion of" the privatization contract, *id.*, because it was

used for the first seven years of contract performance, has been used for eight years since the

termination to provide service pursuant to the Areawide Contract, and will be used by Dominion

for the foreseeable future.  Furthermore, it is both "subject to a separate contract" and "subject . .

. to a special contract requirement governing [its] use or disposition."  *Id.*  The Areawide

Contract contains provisions governing the ownership and use of Dominion "equipment and

facilities" that are "required to provide Electric service at the Delivery Point(s) specified in an

Authorization," DPFUF ¶ 69(l), and the privatization contract itself contains numerous

provisions "governing" the "use or disposition" of the system.  *See, e.g.*, *id.* 10 ¶ (a)-(k).  Most

obviously, the privatization contract specifies the conditions under which the Government, "at its

sole option," could reacquire the system "at the end of the contract term."  *Id.* ¶ 9(f).  Dominion

relied upon that provision in seeking its "Net Unrecovered Investment" in connection with the

Fort Monroe termination.  *Id.* ¶ 94(h).

The distribution system thus is excluded from the definition of "termination inventory."

Even if that were not the case, Dominion's upgrade expenses would not qualify as "other costs

incurred, reasonably necessary for the preservation, protection, or disposition of the termination

inventory," because they are *not* "reasonably necessary for . . . preserv[ing], protect[ing], or

dispos[ing]" of the distribution system.  Instead, Dominion proposes to incur the costs in order to

provide service to jurisdictional customers at some unspecified future time years after the partial

termination.  *See* Pl.'s Mot. 10 ("Substantial additional work must be performed, and dollars

spent, to bring the MLD systems up to regulated standards for use in regulated service."). Notably, these expenses have not been – or largely have not been – "incurred"; even Dominion does not pretend to have expended substantially more than $240,000 on efforts supposedly related to the upgrades.  *See* Matthews Decl., ECF No. 81-3, ¶ 47.

Because the upgrade expenses do not fall within any of the categories of costs that the Government is contractually obligated to pay upon a termination for convenience, Dominion is not entitled to recover them.  Dominion's heavy reliance upon 48 C.F.R. § 31.205-42(b), which addresses "[c]osts continuing after termination," *see* Pl.'s Mot. 30-34; Am. Compl. ¶¶ 116-17, cannot save Dominion's claim.  The termination clause does state that "[t]he cost principles and procedures of part 31 of the Federal Acquisition Regulation, in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this [termination] clause," 48 C.F.R. § 52.249-2(i) (2001), but the general allowability principles set out in part 31 do not supplant the provisions of the termination clause itself.  Indeed, part 31 specifically recognizes that basic fact:

> (a)  A cost is allowable only when the cost complies with all of the following requirements:
>
> (1)  Reasonableness.
>
> (2)  Allocability.
>
> (3)  Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances.
>
> (4)  *Terms of the contract.*
>
> (5)  Any limitations set forth in this subpart.

48 C.F.R. § 31.201-2 (2004) (emphasis added).  Because the contract enumerates the categories of costs the Government must pay in connection with a termination for convenience, and the expenses Dominion claims do not fit in any of those categories, Dominion's claims must fail.

Dominion cannot alter the contours of the Government's contractual liability by invoking what Dominion calls "the requirement to fairly compensate the contractor."  Pl.'s Mot. 36; *see id.* at 36-40; Am. Compl. ¶¶ 124-28.  Dominion locates this "requirement" in 48 C.F.R. § 49.201, which provides in part that a termination "settlement should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract."  This guidance to contracting officers does not assist Dominion, because it merely refers to assessing fairly the amount of costs due under the terms of the termination clause, which provides for the recovery of costs incurred for completed work under the contract and "costs incurred in performance of the work terminated."  48 C.F.R. § 52.249-2(g)(2)(i).  As we have already demonstrated, no amounts are due to Dominion under the termination clause.  The entry of judgment in favor of the United States is therefore fully aligned with the FAR's concept of "fairness."

**B.      Dominion Cannot Prove That The Upgrade Expenses Are Allocable To The Privatization Contract**

As Dominion recognizes, it cannot recover its claimed upgrade expenses unless it proves that they are allocable to the contract.  Pl.'s Mot. 26; *see* 48 C.F.R. § 31.201(a).  Dominion's inability to make that showing provides a second, independent ground for the rejection of Dominion's claims.

"A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship."  48 C.F.R. § 31.201-4. Dominion asserts that the upgrade expenses are allocable to the privatization contract because

they are "incurred specifically for the contract."  Pl.'s Mot. 26-27.  Oddly, however, Dominion's

analysis on that point consists entirely of an argument regarding the meaning of the word

"incurred," *id.* at 27, with no discussion of another obvious flaw in Dominion's position: it is not

apparent how the upgrade expenses, whether presently "incurred" or not, would be "incurred

*specifically for* the [privatization] contract."  48 C.F.R. § 31.201-4(a) (emphasis added).

Because the upgrade expenses were not, in fact, expended prior to the termination of CLIN 0007,

they obviously would have no impact upon the performance of the relevant portion of the

privatization contract.  Furthermore, the purpose of those expenses, when and if they are actually

incurred, will plainly be to facilitate Dominion's work under other contracts – whether with the

United States, the FMA, or with jurisdictional customers pursuant to Dominion's tariff terms and

conditions.  Consequently, all of the "benefits received" from that expenditure would flow to

contracts other than the privatization contract.  There is no discernible basis for concluding, in

such circumstances, that the ugprade expenses are "specifically for" the privatization contract.

As a result, Dominion's argument regarding allocability must fail.

### III.    Judgment Should Be Entered In Favor Of The United States As To Count III Of Dominion's Complaint

Count III of Dominion's complaint is an oddity.  Dominion has labeled it "DEFECTIVE

TERMINATION," Am. Compl. at 32, but we are aware of no cause of action with that name,

and the paragraphs included within the count cite no authorities that would explain the nature of

the legal theory on which Dominion proceeds.  Instead, those paragraphs merely recite various

allegations that are either plainly erroneous or of unclear relevance.  For example, Dominion

contends, "When the Defendant terminated the Contract, the Bill of Sale also terminated,"

supposedly because "[t]he Bill of Sale stated that it was 'subject to' the Contract."  *Id.* ¶¶ 131-32.

Both contentions are plainly wrong.  The Bill of Sale for the Fort Monroe distribution system

does *not* state that it is "subject to" the privatization contract.  *See* Def. Resp. to Pl. SOF ¶ 27(a).

Nor is there any factual or legal basis for believing that the termination of CLIN 0007 somehow

terminated Dominion's ownership of the distribution system.  As the contract specifically

provided, title to the distribution system passed to Dominion upon execution of the easement.

DPFUF ¶¶ 9(d), 9(e), 22.  By the time CLIN 0007 was terminated in September 2011, the

conveyance of the system was a completed transaction; there was no ongoing aspect of it to

"terminate."  Furthermore, because the conveyance was not subject to the FAR, *id.* ¶ 9(c), it

could not somehow be terminated through the termination clause, which is a FAR provision –

and which, in any event, provides for the termination of "work," not of legal interests in

property.  48 C.F.R. § 52.249-2(a).

Similarly bizarre is Dominion's contention that "[t]he Defendant could not and did not

unilaterally reconvey the system to Dominion by virtue of expressing its 'desire' that Dominion

retain ownership of the system in Defendant's second notice of termination issued on June 3,

2011."  Am. Compl. ¶ 132.  Plainly, the Government was not "reconvey[ing]" the system to

Dominion through the termination notice; Dominion had not ceased to hold title to the system,

and the Government had not reacquired it, so there was nothing to "reconvey[]."  Given the

contractual provision allowing the Government to reacquire the system "at its sole option,"

DPFUF ¶ 9(f), and Dominion's presentation to the Government of "options" that involved either

the Government reacquiring the system upon termination or allowing Dominion to keep it, *id.*

¶¶ 41-42, the statement in the June 3, 2011 termination notice cannot be reasonably construed as

anything other than a straightforward indication that the Government did not intend to reacquire

the system.

The relevance of Dominion's unfounded allegations to its theory of liability in Count III is unclear.  The gist of the Count appears to be the following:

> The termination could only be lawful, complete and non-defective if, incident to the termination, the Government compensated Dominion for the costs to bring the system up to regulated standards so that it could be owned by Dominion and accepted into the rate based without adverse impact to other customers in the rate base.

Am. Compl. ¶ 136.  As we have already demonstrated, however, the Government had no legal obligation to "compensate[] Dominion for the costs to bring the system up to regulated standards."  *Id.*  Accordingly, the Government's failure to pay that compensation could not have rendered the termination unlawful or defective.  Dominion's circular argument, unsupported by any legal authorities, provides no basis for relief.  Judgment as to Count III should therefore be entered for the United States.

## IV.   Dominion Has No Claim For An Equitable Adjustment; The Court Would Lack Jurisdiction To Entertain Such A Claim; And The Claim Would Be Meritless In Any Event

In its dispositive motion, Dominion asserts for the first time that it is entitled to an "equitable adjustment" under the termination clause because its ownership of the Fort Monroe distribution system supposedly constitutes contractual "work not terminated," the cost of which has allegedly "become costlier due to the Government's partial termination."  Pl.'s Mot. 34-35. This argument suffers from numerous fatal flaws.

Paragraph (l) of the termination clause, upon which Dominion rests its new argument, provides as follows:

> If the termination is partial, the Contractor may file a proposal with the Contracting Officer for an equitable adjustment of the price(s) of the continued portion of the contract.  The Contracting Officer shall make any equitable adjustment agreed upon.  Any proposal by the Contractor for an equitable adjustment under this clause

36

> shall be requested within 90 days from the effective date of
> termination unless extended in writing by the Contracting Officer.

48 C.F.R. § 52.249-2(l) (2001). This clause is invoked nowhere in Dominion's complaint or its

February 5, 2016 certified claim. In neither document does Dominion suggest that it has a

continuing obligation under the privatization contract to maintain ownership of the Fort Monroe

distribution system, or that it is entitled to an equitable adjustment in the contract price based

upon "increased ownership costs." Pl.'s Mot. 35.

   As an initial matter, Dominion cannot amend its complaint by asserting new claims in its

motion for summary judgment. *See, e.g.*, *Iowa Bankers Benefit Plan v. United States*, 143 Fed.

Cl. 148, 156 (2019); *The Redland Co., Inc. v. United States*, 97 Fed. Cl. 736, 756 (2011). Even

more critically, even if Dominion's new claim did appear in the complaint, this Court would lack

jurisdiction to entertain it pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-09.

"It is a fundamental principle of" the CDA that "contract claims . . . must be the subject of a

contracting officer's final decision." *Northrop Grumman Sys. Corp. v. United States*, 140 Fed.

Cl. 249, 257 (2018) (citing 41 U.S.C. § 7103(a)(1)-(3); *Raytheon Co. v. United States*, 747 F.3d

1341, 1354 (Fed. Cir. 2014)). "To determine whether the claim is the same that in the

contracting officer's final decision, the court considers whether the claims '(1) are based on the

same underlying theory; (2) seek the same relief; and (3) arise from the same operative facts.'"

*Id.* (citation omitted). Claims are distinct "if they *either* request different remedies . . . *or* assert

grounds that are materially different from each other factually or legally." *K-Con Bldg. Sys., Inc.*

*v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015).

   Dominion's equitable-adjustment argument rests upon a materially different legal theory

from the claim presented to the Air Force contracting officer on February 5, 2016. That claim

relied upon the premise that the upgrade expenses constitute "continuing costs" supposedly

37

allowable pursuant to 48 C.F.R. § 31.205-42(b) as part of a termination-for-convenience

settlement.  DPFUF ¶ 101(a); Appx910.  No request for an equitable adjustment to the price of

the privatization contract was made, whether pursuant to 48 C.F.R. § 52.249-2(l) or otherwise.

Dominion did not suggest that it had a continuing obligation under the privatization contract to

maintain ownership of the distribution system.  In other words, Dominion did not present the

claim that it now attempts to raise for the first time in its motion.  Consequently, this Court

would lack jurisdiction to entertain that claim even if it had been properly pled.

Finally, even if the Court could entertain the merits of Dominion's equitable-adjustment

claim, that claim would fail.  First, Dominion failed to comply with the requirement that a

request for equitable adjustment under the applicable provision of the termination clause be

made "within 90 days from the effective date of termination."  48 C.F.R. § 52.249-2(l) (2001).

Its claim is extremely untimely and therefore barred.  *See Do-Well Mach. Shop, Inc. v. United

States*, 870 F.2d 637, 639 (Fed. Cir. 1989) (stating that the failure to submit a claim within the

time required by the termination-for-convenience clause "was fatal to" contractor's claim under

that clause).  Second, Dominion cannot demonstrate that the "continued portion" of the

privatization contract imposes any obligation that Dominion maintain ownership of the Fort

Monroe distribution system.  48 C.F.R. § 52.249-2(l).  The Government terminated the only

CLIN in the contract related to Fort Monroe effective September 15, 2011.  DPFUF ¶¶ 8, 54.

Dominion therefore does not have any continuing obligations under the privatization contract

with respect to Fort Monroe, and it does not have any right to an equitable adjustment of the

price of the privatization contract.  For all of these reasons, Dominion's new equitable-

adjustment theory poses no obstacle to the entry of judgment in the Government's favor as to all

counts of the complaint.

## V.     Dominion Cannot Substantiate The Central Premise Upon Which Its Claims Rest

The grounds already provided demonstrate conclusively that Dominion's claims are meritless.  As a result, to determine that the entry of judgment for the United States is warranted, it is not necessary to sort through Dominion's many inconsistent and cursory contentions regarding the effect of the termination upon Dominion's legal obligations as a regulated utility. Nevertheless, if the Court is inclined to engage in that endeavor, it will find that Dominion's core contentions are unsupported by law or fact.

As we have already noted, Dominion's demand for upgrade expenses rests upon the premise that the termination created a legal obligation for Dominion to make costly changes to Fort Monroe's metering, street lighting, and distribution system.  Am. Compl. at 6, 8, 10; *see* Pl.'s Mot. 9.  The nature of the legal obligations owed by Dominion in any given set of factual circumstances is, of course, a question of law, and the opinions and testimony of witnesses, whether expert or lay, are irrelevant to such a question.  *See* Order, ECF No. 74, at 1-2; *see, e.g.*, *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1368-69 (Fed. Cir. 2003).  As a result, Dominion's many attempts to establish the nature of its asserted legal obligations by simply citing to the report or testimony of its retained expert, John Reed, or to the testimony or declaration of Dominion employee Paul Matthews, *see, e.g.*, Pl.'s SOF, ECF No. 81-2, ¶¶ 6, 56, 59, are unavailing.  Instead, if Dominion wants to convince this Court that certain regulatory requirements, for example, impose a given obligation on Dominion, then Dominion must identify the legal source and substance of those requirements, and explain how the obligation flows from them.

Dominion has utterly failed to do so.  Instead, Dominion has made many conclusory proclamations about its supposed duties under "regulated standards," Pl.'s Mot. 1, 2, 3, 4, 5, 8, 9,

10, 11, *etc.* – a term that appears in no regulation, contract, statute, or administrative order cited by Dominion, and whose true virtue, for Dominion's purposes, appears to be its vagueness.  By comparison, the statutes and regulatory regime applicable to Dominion are quite specific – and they do not accord with Dominion's unsupported assertions regarding the effect of the termination.

### A.      Dominion's Status As A Virginia Utility

Dominion is a provider of electric utility service subject "to the laws of the Commonwealth of Virginia."  DPFUF ¶ 1.  Virginia has enacted an extensive set of statutes governing various aspects of the operation "public utilities."  *See, e.g.*, VA Code §§ 56-232 to -265.  Those statutes define a "public utility" as "every corporation (other than a municipality), company, individual, or association or cooperative . . . that now or hereafter may own, manage or control any plant or equipment or any part of a plant or equipment within the Commonwealth . . . for the production, transmission, delivery, or furnishing of heat, chilled air, chilled water, light, power, or water, or sewerage facilities, either directly or indirectly, to or for the public."  *Id.* § 56-232(A)(1).

Public utilities are required "to furnish reasonably adequate service and facilities at reasonable and just rates to any person, firm or corporation along [their] lines desiring same."  *Id.* § 56-234(A).  They must "charge uniformly therefor all persons, corporations, or municipal corporations using such service under like conditions."  *Id.* § 56-234(B).  Generally, every public utility is required to file with Virginia's State Corporation Commission (SCC) "and to keep open to public inspection schedules showing rates and charges . . . . Every public utility shall file with, and as part of, such schedules, copies of all rules and regulations that in any manner affect the rates charged or to be charged."  *Id.* § 56-236(A).  Such schedules are sometimes called "tariffs."

*See Kroger Co. v. Appalachian Power Co.*, 422 S.E.2d 757, 758 n.1 (Va. 1992) ("A tariff is a schedule of rates, rules, and regulations issued pursuant to an order of the [Virginia] State Corporation Commission.  It sets out the rates which a public utility must charge and the terms and conditions under which it is required to supply service to its customers.").  The SCC must "review the rates of any public utility on an annual basis when . . . such annual review is in the public interest," VA Code § 56-234.2, and may order modifications to "the rates, tolls, charges, schedules, or joint rates of any public utility operating in" Virginia if it determines that they are "unjust, unreasonable, insufficient or unjustly discriminatory . . . or otherwise in violation of any of the provisions of law."  *Id.* § 56-235.

Notably, services provided to the Federal or Virginia government by a public utility are expressly excluded from the coverage of this statutory scheme.  Although a public utility must provide service to a "person, firm or corporation along its lines," none of those terms refers to the state or Federal government.  VA Code § 56-1 (definitions of "[p]erson" and "[c]orporation").  "[T]he term 'schedules' as used in §§ 56-234 through 56-245" does "not include contracts of telephone companies with the state government or contracts of other public utilities with municipal corporations or the federal or state government."  *Id.* § 56-23(E).  And although it is "the duty of every public utility to charge uniformly therefor all persons, corporations or municipal corporations using such service under like conditions," nothing in that statutory provision "appl[ies] to . . . contracts for service rendered by any telephone company to[] the state government or any agency thereof, or by any other public utility to any municipal corporation or to the state or federal government."  *Id.* § 56-234(B).  A specific statutory chapter establishes another framework exclusively governing electric utilities, *see id.* §§ 56-576 to 56-596.3, but expressly provides that, with limited, enumerated exceptions, "nothing in this chapter

41

shall authorize the Commission to regulate the rates or charges for electric service to the Commonwealth and its municipalities." *Id.* § 56-581(C). Section 56-235, authorizing the SCC to modify the "rates, tolls, charges, schedules or joint rates of any public utility operating in Virginia," does not authorize the SCC to review or modify the rates at which service is provided by a public utility to the state or Federal government. *Commonwealth v. Virginia Elec. & Power Co.*, 201 S.E.2d 771, 775 (Va. 1974). For all of those reasons, Virginia state government agencies and agencies of the United States are often referred to as "non-jurisdictional" customers of public utilities in Virginia. *See, e.g.*, *Application of Virginia Elec. & Power Co.*, Case No. PUE-2016-00048, Hearing Examiner Report, 2016 WL 6825375, at *5 (Va. S.C.C. Nov. 14, 2016) ("As a non-jurisdictional customer, the Commonwealth's electric rates are not subject to jurisdiction by the Commission; instead, its rates are governed by contract."); Pl.'s App., ECF No. 81-5, at A157-58.

### B. Dominion's Legal Obligations With Respect To Fort Monroe

As an initial matter, Dominion asserts that, "the Contract termination ended the unregulated status of the Fort Monroe system and made Fort Monroe subject to inclusion in Dominion's regulated utility base." Pl.'s Mot. 9. That statement is supported only by a reference to an irrelevant expert report, *see id.*, and is not consistent with Virginia law. Because the Government is a non-jurisdictional customer of Dominion, its contracts with Dominion for service to Fort Monroe prior to the termination of CLIN 0007 were not subject to the jurisdiction of the Virginia SCC, and its Areawide Contract with Dominion for service to the Fort Monroe Site *after* the termination of CLIN 0007 was and is not subject to the jurisdiction of the Virginia SCC. It is therefore unclear how "the Contract termination ended the unregulated status of the Fort Monroe system." Pl.'s Mot. 9.

Dominion also fails to substantiate its assertions that, because of the termination, Dominion has a legal obligation to upgrade the so-called "MLD Systems." Pl.'s Mot. 9. According to Dominion, "because the Government ended Fort Monroe's contiguous parcel formation when it conveyed portions to the Commonwealth . . . , the property no longer qualified for a single campus-style meter excess facilities configuration under" the terms and conditions set out in Dominion's tariff schedule. *Id.* at 10. In support of that proposition, Dominion again cites only irrelevant evidence: Mr. Matthew's declaration and Mr. Reed's report. *See id.* (citing SOF ¶ 58). Dominion's brief does not even cite the tariff in question. More importantly, at all times since the termination of CLIN 0007, Dominion has served the Fort Monroe Site pursuant to the Areawide Contract, under which the Government may procure services that are not available under Dominion's tariff, *see* DPFUF ¶ 69(i)-(j) – services such as the master metering arrangement that Dominion agreed to in the Authorization, and for which the Army agreed to pay a large "facilities charge" every month. *See id.* ¶¶ 73-76. When the Authorization under the Areawide Contract ultimately expires or is terminated, the FMA or Virginia – each a non-jurisdictional customer of Dominion, like the United States – may enter into a similar contract, and thereby continue the use of the master meter. Indeed, that is precisely what the FMA has consistently planned to do. *See* Appx1022-25. The FMA may choose to ask Dominion to install individual meters within the Fort Monroe Site – but again, that would be the FMA's choice, not a legal necessity. *See* Appx996-98, 1081-82.

As with its contentions concerning metering, Dominion's proclamation that street lighting at Fort Monroe must be upgraded to meet "regulated standards" is unsupported by any legal analysis whatsoever. *See* Pl.'s Mot. 11 (citing Pl.'s SOF ¶ 59). But, as with metering, Dominion presently provides service to the Fort Monroe Site, including its un-upgraded

43

streetlights, pursuant to the Areawide Contract – and presumably could do the same pursuant to a similar contract with Virginia or the FMA.  Exactly the same analysis applies to the Fort Monroe distribution system; Dominion uses that un-upgraded system to provide service pursuant to the Areawide Contract and could do the same under a contract with Virginia or the FMA.  Indeed, Dominion's employee Mr. Matthews conceded, while testifying pursuant to RCFC 30(b)(6), that if Dominion were to enter into the equivalent of a privatization contract with Virginia, there would be "no requirement, in Dominion's view, to upgrade the metering, light, and distribution system to conform to regulated service."  Appx1081-82.

One salient fact points unequivocally to the conclusion that even Dominion knows its arguments are fallacious: for all of Dominion's declarations that it was legally obligated to make the MLD upgrades upon the termination of the contract, Dominion has *not* made them.  DPFUF ¶¶ 120-21; Matthews Decl. ¶ 47.  In fact, as of early 2018, Dominion had not even *begun* to implement any upgrades.  DPFUF ¶ 121.  Given the weakness of Dominion's theories, it cannot prevail upon its claims.

## CONCLUSION

For these reasons, we respectfully request that the Court deny Dominion's motion for partial summary judgment, grant our cross-motion, and enter judgment in favor of the United States.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

/s/ Barbara E. Thomas
BARBARA E. THOMAS
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-0461
barbara.e.thomas@usdoj.gov

*Attorneys for Defendant*

ERIKA L. WHELAN RETTA
Trial Attorney
Air Force Legal Operations Agency

*Of Counsel for Defendant*

DATED:  October 7, 2019