# In the United States Court of Federal Claims

No. 17-464C
(Filed: January 28, 2020)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIRGINIA ELECTRIC AND POWER
COMPANY d/b/a DOMINION
ENERGY VIRGINIA,

                    *Plaintiff*,

v.

THE UNITED STATES,

                    *Defendant*.

Contracts; termination for convenience; allowable costs; FAR 52.249-2 (1996); FAR 31.205-42(b) (2018); summary judgment; upgrade costs; utilities.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Alan M. Freeman*, Washington, DC, for plaintiff. *Albert B. Krachman* and *Jaret N. Gronczewski*, of counsel.

    *Barbara E. Thomas*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Patricia M. McCarthy*, Assistant Director, for defendant. *Erika L. Whelan Retta*, Trial Attorney, Air Force Legal Operations Agency, of counsel.

OPINION

BRUGGINK, *Judge*.

    Plaintiff claims that the United States owes Virginia Electric and Power Company, doing business as Dominion Energy Virginia ("Dominion"), the cost of upgrading the metering, lighting, and distribution of the electrical system at Fort Monroe, a military base in the Commonwealth of Virginia. The United States, acting through the Defense Energy Support Center, entered into a 50-year contract with Dominion in 2004 for utility services ("the Utility Services Contract") and contemporaneously, but separately, sold Dominion the electrical system at Fort Monroe. On September 15, 2011, the Army terminated for convenience the Utility

Services Contract. Subsequently, the United States and Dominion settled certain cost claims relating to the termination and entered into a separate contract for Dominion to supply electricity and certain utility services at Fort Monroe. The only outstanding question is whether the United States is liable, under the terminated line item of the Utility Services Contract, for potential future upgrade costs, i.e., costs not incurred prior to termination.

Plaintiff asserts that the United States terminating the Utility Services Contract unavoidably triggered an obligation for plaintiff, which continues to own the electrical system, to bring the system up to higher standards than those that would have applied if the Utility Services Contract had continued. It points to its obligations under state law and corporate policies.

Pending are the parties' cross-motions for summary judgment. Plaintiff moved for summary judgment as to liability on its Counts I, II, and IV; its motion is silent on Count III. Defendant cross-moved for summary judgment on Counts I, II, and IV and moved for summary judgment on Count III. Plaintiff requested summary judgment on Count III in a footnote of its response brief. Defendant also moved for summary judgment on an equitable adjustment theory raised for the first time in plaintiff's motion. The motions are fully briefed. The Fort Monroe Authority, represented by Virginia's Office of the Attorney General, submitted an amicus brief in support of plaintiff's position. The court held oral argument on December 11, 2019. For the reasons set out herein, we deny plaintiff's motion for summary judgment and grant the government's motion.

## BACKGROUND

In the late 1990s, Congress authorized the Secretaries of the Military Departments to privatize utility systems on military bases as a cost-saving mechanism. The statute authorized the departments to "convey a utility system, or part of a utility system, under the jurisdiction of the Secretary to a municipal, private, regional, district, or cooperative utility company or other entity." 10 U.S.C. § 2688(a) (2018).

The Secretary of Defense later issued a directive to the Military Departments "to privatize all utility systems, except where needed for unique security reasons or when privatization is uneconomical." Def.'s App. 7. Privatization meant "the total divestiture of a utility system through the transfer and conveyance of the installation's utility infrastructure assets in conjunction with and for the purpose of the conveyee providing utility

distribution services on a long-term basis." *Id.* The directive thus outlined two goals: (1) divest the United States of utility systems and (2) secure utility services.[1]

To implement this directive, in 2001, the Defense Energy Support Center issued a solicitation seeking "offerors to assume ownership, operation and maintenance of the utility infrastructures" at four Army bases: Fort Monroe, Fort Eustis, Fort Story, and Fort Lee.[2] *Id.* at 11. Fort Monroe, which is in Hampton, Virginia, and at the time encompassed 568 acres, is the base at issue here. The available utility infrastructures at Fort Monroe were electric, natural gas, water, and wastewater.[3] The solicitation outlined two different transactions: (1) purchase of utility systems and (2) a 50-year Utility Services Contract.

Dominion offered to buy the electrical systems and supply utility services at Fort Monroe, Fort Eustis, and Fort Story. Dominion offered two alternatives for its provision of service. First, it offered a "regulated proposal" under which the United States would pay for bringing the electrical system up to certain modern standards imposed on Dominion's other customers. Alternatively, it offered an "unregulated proposal" under which "[t]he electric system components were not required to meet – and they did not meet – the same regulated standards applicable to comparable systems serving regulated customers in other parts of Dominion's Virginia service territory." Pl.'s Mot. Summ. J. 1; Am. Compl. ¶ 15 ("In a nutshell, before the contract termination, the Fort Monroe utility system was exempt from meeting regulated standard.").

The Defense Energy Support Center awarded Dominion a contract for utility services on the electrical systems at those three bases on June 24, 2004. The Preamble summarized the Utility Services Contract as follows:

> [Dominion] shall assume ownership, operation and maintenance of the electric distribution systems at Fort Eustis,

---

[1] Utility services meant operation and maintenance of the system rather than supplying the commodity, such as electricity.

[2] The solicitation did not seek proposals for the sale of electricity.

[3] The Army owned and operated the electrical system at Fort Monroe, while Dominion supplied electricity under a separate, unrelated contract. Dominion supplied electricity to "[a] single 13.2-kV Virginia Power delivery point . . . near the center of the installation," which the Army's electrical system then distributed throughout the base. Def.'s App. 136.

Fort Story, and Fort Monroe, Virginia. [Dominion] shall furnish all necessary labor, management, supervision, permits, equipment, supplies, materials, transportation, and any other incidental services required for the complete ownership, operation, maintenance, repair, upgrade, and improvement of the utility system. These services shall be provided in accordance with all terms, conditions, and special contract requirements, specifications, attachments, and drawings contained explicitly in this contract or incorporated by reference.

Def.'s App. 99. The Preamble incorporated a version of Dominion's proposal into the Utility Services Contract. Of importance here, the incorporated proposal was the "unregulated" proposal, which meant that the United States accepted the proposal that did not require Dominion to upgrade the system to modern standards for its metering, lighting, or distribution, among other things.

The Utility Services Contract did not convey the electrical system to Dominion. Rather, the Utility Services Contract provided at section C.2.2: "The conveyance of the utility system is authorized by and conducted under 10 USC § 2688. The conveyance of the utility system is not an acquisition and therefore is not subject to the FAR and its supplements." *Id.* at 20. Section C.5.1 explained:

Prior to the transfer of title, such facilities shall continue to be owned by the Government. Transfer of title shall be accomplished by Easement. The Easement shall provide the complete list of all assets to be sold. . . . The parties shall prepare and execute such additional documents as may be necessary to implement the ownership transfer.

*Id.* at 25. In other words, transfer of ownership of the infrastructure, although related to the Utility Services Contract, was accomplished separately.

After entering the Utility Services Contract, the parties executed the Bill of Sale, Easement, and Promissory Note. The Bill of Sale, executed on February 16, 2005, stated:

The United States of America . . . sells, transfers and conveys to the Virginia Electric and Power Company dba Dominion Virginia Power, . . . the property described below:

4

All those certain facilities and equipment, including, but not limited to, substations, switching stations, transformers, exterior lighting, overhead electrical lines, and underground electrical lines, comprising the Fort Monroe, Virginia electrical system, all or part of which is more particularly described on Exhibit "A", attached hereto and made a part of this Bill of Sale.

This sale is subject to the following provisions:

1. The terms and conditions found in the Utility Distribution Contract No. SP0600-04-C-8253 and Department of the Army Easement No. DACA65-2-05-34 being agreements between the Government and the Grantee;

2. The Government covenants that it has good and valid title to the facilities and equipment being conveyed by this Bill of Sale, . . . and

3. The Government makes no warranty with regards to the condition of the facilities and equipment.

*Id.* at 149 (emphasis omitted).

The Easement, also executed on February 16, 2005, provided in pertinent part:

The Secretary of the Army, under and by virtue of the authority vested in the Secretary by Title 10, United States Code, Section 2688 and Title 10, United States Code, Section 2668, having found that the granting of this easement is not incompatible with the public interest, hereby grants to: Virginia Electric and Power Company dba Dominion Virginia Power, hereinafter referred to as the Grantee, an easement for construction, operation, maintenance, repair and replacement of electric utility system, including all right, title and interest in and to all appurtenances located thereon, hereinafter referred to as the facilities, over, across, in and upon lands of the United States as identified in Exhibit(s) "A" and "B", hereinafter referred to as the premises, and which are attached hereto and made a part hereof. This easement is issued in conjunction with Utility Distribution Contract No.   SP0600-04-C-82S3

5

hereinafter referred to as the contract, between the Government and the Grantee.

This easement is granted subject to the following conditions.

1. Term[:] This easement is hereby granted for a term of fifty (50) years, beginning December 1, 2004, and ending November 30, 2054.

2. Contract-Easement Relationship[:] This easement and the contract shall not merge, but the terms and conditions of each shall survive the execution and delivery of this easement and any subsequent recordation thereof. In the event the terms and conditions of this easement conflict with the terms and conditions of the contract, the terms and conditions of the contract shall prevail. . . .

3. Transfer of Ownership

   a. The Fort Monroe Military Installation's Electrical System consists of, but is not limited to:

      1. Approximately 586 street lights/poles

      2. Approximately 106,428 linear feet of underground electric lines

      3. Approximately 2,227 kilo volts transformers (including 139 underground structures/manholes, 20 miles of underground lines and 107 underground transformers

      4. One-(1) 300 KV Sub/Switch Station Building which includes 9 switching cabinets

   b. The ownership of the Fort Monroe Military Installation's electrical system is hereby transferred by the Government and accepted by the Grantee.

*Id.* at 150-65 (emphasis omitted). The practical effect of these documents was to convey the electrical system to Dominion and grant Dominion a 50-year right of access to the Fort Monroe property.

In the third element of the transaction, Dominion executed a Promissory Note on February 28, 2005, promising to pay the Army $2,133,075.93 for the Fort Monroe electrical system. The parties incorporated the Bill of Sale, the Easement, and the Promissory Note into the Utility Services Contract through Modification 4 dated April 20, 2005.

Finally, regarding ownership of the electrical system itself, the Utility Services Contract provided in paragraph 4 of the Preamble:

> [A]t the end of the contract term [Dominion] may submit a claim for unrecovered investments. . . . The parties anticipate that at its expiration this contract may be renewed at mutually satisfactory terms. If the contract is renewed, no claim for unrecovered investments shall be allowed. If the contract is not renewed and [Dominion's] claim for unrecovered investments is allowed, the Government may, at its sole option, reacquire the electric distribution system in its entirety for the amount of the unrecovered investment claim settlement without additional compensation. The reacquisition shall be effective upon payment of the unrecovered investment claim settlement. In the event the Government exercises its reacquisition option the electric system shall be tendered to the Government free of liens or encumbrances of any kind.

*Id.* at 99.

The Utility Services Contract had three line items, one for each military base: CLIN 1 Fort Eustis, CLIN 7 Fort Monroe, and CLIN 11 Fort Story. Each contract line item had two components: (1) the Fixed Monthly Charge for utility services and (2) the Monthly Credit as Payment for Purchase Price. The Fixed Monthly Charge represented what the United States would pay Dominion for two sub-components of utility services: (a) operations and maintenance and (b) renewals and replacements. The parties set the Fixed Monthly Charge for the first two years of the contract term, with later years subject to price redetermination. The parties could adjust the Fixed Monthly Charge for Capital Upgrades as set out in the contract. The Monthly Credit represented the monthly part of the $2 million purchase price that the United States would subtract from the Fixed Monthly Charge. CLIN 7 set out the two components as follows:

**Fort Monroe, Virginia**

| CLIN | Utility System | |
|---|---|---|
| 0007 | Electric Distribution System | |
| Sub-CLINS | SUPPLIES/SERVICES | MONTHLY SERVICE CREDIT / CHARGE |
| AA *<br>Year 1 | Fixed Monthly Charge (see B.3.2.1, *Service Charges*)<br>The Contractor shall provide utility service in accordance with<br>Section C, *Descriptions, Specifications, and Work Statement.*ᵃ | $103,536.00 |
| AA<br>Year 2 | Fixed Monthly Charge (see B.3.2.1, *Service Charges*)<br>The Contractor shall provide utility service in accordance with<br>Section C, *Descriptions, Specifications, and Work Statement.*ᵃ | $75,622.00 |
| AB | Monthly Credit as Payment for Purchase Price (see B.3.2.2,<br>*Monthly Credit as Payment for Purchase Price*).<br><br>$30,684.00 Monthly Credit for 240 months. | ($30,684.00) |

*a  Additions to the Fixed Monthly Charge will be handled in accordance with Section H.9, Accounting for Capital Upgrades / Purchase Price, and Schedule B-2 but should not be included in the price offered for Sub-CLIN AB.*

**\*  SubClin AA Year 1 will begin at the Performance Start Date (See Section C.13.1) per contractor's proposal and email dated May 30, 2003.  SubClin AA Year 2 will begin 12 months thereafter.  No charges shall occur before the Performance Start Date.**

*Id.* at 103.

Although the parties chose the "unregulated" option, the Utility Services Contract nevertheless provided in section C.11.1 that Dominion was "responsible for accomplishing all required upgrades and renewals and replacements to maintain and operate the utility system(s) in a safe, reliable condition, and to meet the requirements of this contract." *Id.* at 118. Plaintiff specifically proposed a list of Initial Capital Upgrades in its Schedule B-2, which were "those repair, replacement, and improvement activities" that Dominion would complete to bring the system as purchased up to applicable regulatory and corporate standards; the Initial Capital Upgrade did not include the metering, lighting, and distribution at issue in this case. *Id.* Upgrades also included Future Capital Upgrades, namely "investments in the utility system resulting from changes in the requirements, laws or regulations." *Id.* The contract defined renewals and replacements as "investments in the utility system to renew or replace system components that fail or reach the end of their useful life." *Id.*

The parties anticipated that Dominion would submit "an Annual Capital Upgrades and Renewals and Replacements Plan that identifies capital upgrades and major renewals and replacements the Contractor intends to accomplish." *Id*. The Utility Services Contract further explained that the government reserved "the right to determine at its discretion, whether it will pay for any portion of proposed upgrades." *Id.* at 118-19. The government would pay for approved upgrades when accomplished. The contract stated

8

that the government would pay for the renewals and replacements named in Schedule B-2 and set out a process for approving future capital upgrades.

Not included in the upgrades and renewals proposed initially, plaintiff concedes, were the upgrade costs sought here. The claimed upgrade costs do not fall within the upgrade categories, plaintiff explained, because the government chose the "unregulated" contract approach when it entered into the Utility Services Contract. Moreover, even if the "unregulated" contract would have covered the anticipated work, the United States did not order the upgrades Dominion now claims under the contract and Dominion did not begin the disputed upgrade work during the contract performance period.

Section I.2 incorporated "FAR 52.249-2 Termination for Convenience of the Government (Fixed Price) Sep 1996" into the Utility Services Contract. *Id.* at 47. That clause stated:

> (a) The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date. . . .

> (e) After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer . . .

> (f) Subject to paragraph (e) of this clause, the Contractor and the Contracting Officer may agree upon the whole or any part of the amount to be paid or remaining to be paid . . .

> (g) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows . . .:

> (1) The contract price for completed supplies or services accepted by the Government . . . not previously paid for, adjusted for any saving of freight and other charges.

> (2) The total of—

> (i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense

allocable thereto, but excluding any costs attributable to supplies or services paid or to be paid under subparagraph (g)(1) of this clause;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (g)(2)(i) of this clause; and

(iii) A sum, as profit on subdivision (g)(2)(i) of this clause . . .

(3) The reasonable costs of settlement of the work terminated, including— (i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data; (ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and (iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory. . . .

(i) The cost principles and procedures of Part 31 of the Federal Acquisition Regulation . . . shall govern all costs claimed, agreed to, or determined under this clause. . . .

(l) If the termination is partial, the Contractor may file a proposal with the Contracting Officer for an equitable adjustment of the price(s) of the continued portion of the contract. . . . Any proposal by the Contractor for an equitable adjustment under this clause shall be requested within 90 days from the effective date of termination unless extended in writing by the Contracting Officer. . . .

FAR 52.249-2.

The United States did not give Dominion the opportunity to perform under the Utility Services Contract for fifty years. Instead, in 2005, Congress selected Fort Monroe for closure under the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, as amended by later statutes. Am. Compl. ¶ 12. From 2005 to 2011, the United States and the Commonwealth of Virginia laid the groundwork for what would happen to the Fort Monroe property once it was no longer a United States military base.

Virginia is a player here, because the Commonwealth, in two deeds dated 1838 and 1936, conveyed about 285 acres of the property occupied by Fort Monroe to the United States. The deeds stated that title to the property would revert to Virginia if the United States ceased using the property for "fortification or national defense." Def.'s App. 483. Virginia had also conveyed another part of the Fort Monroe property to the United States, and although Virginia did not hold the same reversionary interest in that property, the United States and Virginia negotiated a transfer of that property back to the Commonwealth as well. The United States and Virginia negotiated these transfers of property after Congress selected Fort Monroe for closure. Over time, Virginia created an entity responsible for Virginia's portion of the Fort Monroe property: The Fort Monroe Authority.

On January 27, 2011, the contracting officer sent Dominion a memorandum titled "Operation and Maintenance Contract SP0600-04-C-8253 Partial Termination for Convenience of the Government." *Id.* at 259. The memorandum stated:

1. The Army, in compliance with Base Realignment and Closure [] Public Law, will close Fort Monroe on 15 September 2011. By this date, Army missions will be relocated and property will transition to the Commonwealth of Virginia. In accordance with Federal Acquisition Regulation clause 52.249-2— Termination for Convenience of the Government (Fixed-Price), contract line item number 0007 for Privatization of Fort Monroe, Virginia Electric Distribution System is hereby terminated for convenience effective 15 September 2011.

2. It is requested that you submit a termination settlement proposal no later than 28 March 2011. If you have any questions, please contact the undersigned at [contact information].

*Id.*

Dominion informed the contracting officer that, in Dominion's view, the partial termination for convenience notice was insufficient because "it did not clearly state the Government's desire upon termination," specifically whether the United States would exercise its option to reacquire the electrical system. *Id.* at 260. Following discussions with Dominion, on June 3, 2011, the Director of Business Operations, 633d Contracting Squadron,

Department of the Air Force, sent Dominion a revised memorandum regarding the termination of Utility Services Contract CLIN 7. The first paragraph replicated the first paragraph of the original memorandum. The final paragraph again requested a termination settlement proposal, now by August 2, 2011. New paragraph two stated,

> The Army desires [Dominion] to continue ownership of the electrical distribution system at Fort Monroe after termination effective date. While the Army continues to own the property[,] it will continue to provide [Dominion] with a standard utility easement for future access to the distribution system. The Army believes these easements will be conveyed with the land and be further granted by the Fort Monroe Authority or any other future property owner as a requirement in the terms of the conveyance from the Army.

*Id.* at 266. Dominion submitted its settlement proposal on August 2, 2011.

On September 15, 2011, the Utility Services Contract CLIN 7 terminated. As of September 15, 2011, Dominion owned the Fort Monroe electrical system, but Dominion no longer sold the United States utility services. The United States owned the real property at Fort Monroe.

On October 24, 2011, Dominion and the Army Contracting Command at Rock Island executed an "Authorization for Electric Service" under a preexisting Contract No. GS-00P-08-BSD-0560. That contract is an areawide public utility contract between the General Services Administration and Dominion, executed in 2008, which we will refer to as the Areawide Contract. *Id.* at 239-56, 274. The Areawide Contract is a "master contract" issued "to cover the utility service acquisitions of all Federal agencies in the franchised certificated service territory from [Dominion] for a period not to exceed ten (10) years." *Id.* at 241. The Authorization stated that Dominion would provide "Continue[d] Service" and "Special Facilities" to Fort Monroe, effective September 15, 2011, and continuing "until notified by Customer." *Id.* at 274.

The Authorization stated that Dominion would provide electric "[s]ervice through one 7.5 mVA transformer to multiple delivery points with primary metering at 13.2 kV[] [i]nstead of[] [s]ervice through two 2800 kVa transformers . . . with totalized secondary metering." *Id.* at 276-77. The Authorization also stated that the United States would pay Dominion a

"monthly facilities charge" of $54,655.77 for providing those "facilities" and the government would pay Dominion an added amount each month for the electricity supplied and delivered to Fort Monroe. *Id.* at 279. This Authorization under the Areawide Contract filled the gap left by the terminated CLIN 7 of the Utility Services Contract by compensating Dominion for electricity plus certain utility services. The United States remained Dominion's customer.

After the Utility Services Contract termination, Dominion and the government negotiated Dominion's compensation for the termination through a series of amended termination settlement proposals, two certified claims, and an appeal to the Armed Services Board of Contract Appeals. The United States and Dominion settled Dominion's claims for net unrecovered investments and settlement costs. The outstanding dispute between the parties relates solely to the cost for future upgrades to metering, lighting, and distribution on the Fort Monroe electrical system that Dominion believes it must complete due to the termination of the "unregulated" contract.

The first transfer of real property from the United States back to Virginia did not occur until 2013. By a quitclaim deed transferring a part of the real property at Fort Monroe, the United States split ownership of the real property at Fort Monroe between the United States and Virginia. Since that time, the United States has transferred more Fort Monroe property to Virginia. Virginia has also conveyed some of the property back to the United States for use as a national monument. The United States and Virginia still split ownership of the property as of the date of oral argument. Dominion continues to own the Fort Monroe electrical system, and the United States remains the customer of record for Dominion's purposes.

Dominion takes the position that each of the foregoing events—the termination of CLIN 7, the United States' failure to reacquire the electrical system, the United States exchanging property at Fort Monroe with Virginia, and the possibility of multiple future customers at Fort Monroe (governmental and non-governmental)—"caused Dominion to incur an obligation under its Tariff (and per its T&Cs) to modify the [metering, lighting, and distribution] to meet the same regulated standards applicable to comparable systems serving Dominion's regulated rate base." Pl.'s Mot. Summ. J. 9. To support this belief, plaintiff cites its obligation under Virginia state law to provide reasonably adequate services and just rates to its regulated rate base without preferential treatment as well as its internal

corporate policies and broader industry standards. *See, e.g.*, *id.* at 9, 12, 23, 24. Notably, the United States, which remains Dominion's customer at Fort Monroe, has not ordered such work under the existing federal Areawide Contract. Neither the parties' briefing nor that of the amicus state that the Fort Monroe Authority or other Virginia authority has ordered this work. Dominion's belief is that the upgrade work is an independent legal obligation arising out of its status as a regulated utility company in Virginia and out of its corporate policies.

Dominion and the Fort Monroe Authority have discussed a contract between Dominion and the Fort Monroe Authority for utility services and electricity at the Fort Monroe property; the goal is for the Fort Monroe Authority to replace the United States as Dominion's contracting partner. Plaintiff is concerned, however, that any such future contract would not compensate Dominion for its perceived obligation to upgrade facilities. The Fort Monroe Authority is similarly concerned that Dominion will pass on the cost of any upgrade work to Virginia. Dominion and the Fort Monroe Authority's negotiations have failed due to their belief that someone else, preferably the United States, must first commit to pay for upgraded metering, lighting, and distribution.

Defendant acknowledges that Dominion has chosen to spend $240,000 to begin upgrades. The parties agree that the government did not order the work nor did Dominion begin the work during performance of the contract at bar. Dominion concedes that it has not completed its projected upgrades. It estimates that the total cost of the upgrades, including the amount already spent, will be approximately $13 million. Dominion filed suit in this court in 2017 seeking payment for the cost of upgrading the metering, lighting, and distribution at Fort Monroe.

## DISCUSSION

To be clear at the outset, plaintiff is not making a claim for costs incurred during the performance of the Utility Services Contract or for costs already spent as part of the termination for convenience. Instead, plaintiff's various arguments flow from two assumptions: (1) Had the United States allowed the Utility Services Contract to continue, plaintiff would not be obligated to upgrade the metering, lighting, and distribution, because the contract did not require those upgrades; alternatively, if those upgrades became necessary during the life of the contract, the contract set out a process for recouping that cost from the United States, a process no longer available

to plaintiff. And (2) the United States, by terminating CLIN 7 of the Utility Services Contract, triggered an obligation—external to the Utility Services Contract, found in Virginia state law and plaintiff's corporate policies—for Dominion to upgrade the metering, lighting, and distribution at Fort Monroe, foisting onto plaintiff costs that it had not planned to expend at Fort Monroe.

Plaintiff advances five theories of liability under which the United States must pay for the upgrades: (1) The upgrades are an allowable cost under FAR 31.205-42(b) caused by the termination for convenience of the Utility Services Contract. (2) The upgrade costs are fair compensation after a termination for convenience under FAR 49.201. (3) The termination for convenience of the Utility Services Contract was defective without such payment. (4) Failing to pay for the upgrade costs constitutes a breach of the Utility Services Contract. Plaintiff's motion for summary judgment also introduced a new theory that, (5) because the termination of the Utility Services Contract was partial, plaintiff is entitled to an equitable adjustment for its increased cost of performance under the other two contract line items.

In Count I, plaintiff argues that the cost to upgrade the metering, lighting, and distribution will be attributable to the contract as unavoidably continuing after termination. It estimates the cost to be $13 million. Plaintiff relies on FAR 31.205-42(b) Costs Continuing After Termination:

> Contract terminations generally give rise to the incurrence of costs or the need for special treatment of costs that would not have arisen had the contract not been terminated. The following cost principles peculiar to termination situations are to be used in conjunction with the other cost principles in subpart 31.2: . . .

> (b) Costs continuing after termination. Despite all reasonable efforts by the contractor, costs which cannot be discontinued immediately after the effective date of termination are generally allowable. . . .

Despite citing subsection -42(b), plaintiff does not argue that Dominion could not discontinue the upgrade work immediately after termination. In fact, plaintiff insists that, under the Utility Services Contract, this specific upgrade work was not required, and it concedes that the work was not underway during the pre-termination period. Instead, plaintiff relies on the introductory language: "costs that would not have arisen had the

15

contract not been terminated." *Id.* Plaintiff contends that, had the United States not ended the contract some forty-three years early or had the United States reacquired the electrical system from plaintiff, Dominion would not face an obligation to upgrade the metering, lighting, and distribution. When the government terminated early, plaintiff argues, the termination subjected Dominion to the broader requirements of state law and Dominion's policies to upgrade the system. Therefore, "but for" the termination, the upgrade costs would not have arisen.

We address below the question whether plaintiff has established its critical assumption that termination altered its legal obligation to upgrade the Fort Monroe electrical system. For the moment, we will accept that assumption. Even accepting plaintiff's "but for" argument, however, the fundamental problem is that these upgrade costs are unconnected to the work Dominion performed under the Utility Services Contract. They are not contract costs continuing after termination. They are costs that Dominion will incur, if at all, because of separate contracts or obligations. They have not been nor will they be performed in satisfaction of the terminated work.

Plaintiff bought an outdated electrical system. The parties agreed at oral argument that plaintiff has owned the system since 2005 and that the termination did not interrupt that ownership. Dominion knew prior to purchase that the system did not meet Dominion's "regulated standard"— whether internally imposed or imposed by law—for a modern electrical system as far as metering, lighting, and distribution are concerned. Plaintiff paired that risky purchase with a services contract that it believed would last at least fifty years, hoping to spread out the cost of repairs over many decades. Yet the services contract that plaintiff agreed to did not provide Dominion with any guarantee that the United States would reacquire the system at the end of the contract term or upon termination and, critically, allowed the United States to end the utility services part of the bargain at its own convenience. Moreover, the Utility Services Contract did not bargain for, much less guarantee, that the United States would pay for such an upgrade prior to or after termination.

The cases Dominion relies on highlight the difference between the costs arising after termination that are attributable to the contract and the costs Dominion seeks in this case. In *Nolan Bros., Inc., v. United States*, for instance, the contractor wore out the tires on its equipment performing an excavation contract. 194 Ct. Cl. 1, 22 (1971). The contractor claimed the

price of new tires following the termination. The Court of Claims held, "The expense involved in replacing tires worn out as a result of [operating plaintiff's equipment] on the job during the pre-termination period was [recoverable], irrespective of whether the actual replacement of such tires occurred during the pre-termination period or after the work under the contract was terminated." *Id.* Dominion points to *Nolan Brothers* as an example of a recoverable cost that arose after termination. The difference between *Nolan Brothers* and Dominion's claim, however, is that the *Nolan Brothers* contractor wore out its tires while *performing the contract*. The Utility Services Contract did not include the costs that Dominion claims here, because, with the United States as its contracting partner on the "unregulated" contract, Dominion did not have its alleged legal obligation to upgrade the metering, lighting, and distribution. Plaintiff did not perform any of the upgrade work, what little it has done so far, during contract performance. Dominion is thus not looking to replace something worn out in the performance of the contract but instead is looking to have a former customer pay for an upgrade that a later customer might demand.

Plaintiff also cites *White Buffalo Construction, Inc. v. United States*, in which this court held that the United States must pay the contractor "fair compensation for any additional repairs occurring after termination that were necessitated by the contract work." 52 Fed. Cl. 1, 11 (2002). In that case, the contractor used its equipment during performance of the contract. Here, Dominion concedes that the Utility Services Contract did not require upgrading the metering, lighting, and distribution system and that it did not undertake the work during the performance period.

Plaintiff's focus on a single line in FAR 31.205-42, "costs that would not have arisen had the contract not been terminated," is unpersuasive because section -42(b) clearly assumes a connection between the substance of the contract and the claimed cost. Furthermore, the termination clause, FAR 52.249-2, lists categories of costs predicated on some connection between the performance of the contract and the cost arising or continuing after termination. For instance, the termination clause particularly lists "costs incurred in the performance of the work terminated" and "the reasonable costs of settlement of the work terminated," such as costs necessary to preserve or dispose of termination inventory. FAR 52.249-2(g)(2)-(3). Plaintiff does not cite these categories or any other in the termination clause in its complaint or briefing, perhaps because these categories also require some nexus between the work anticipated under the contract and the costs

plaintiff claims. The costs claimed here instead relate to work that Dominion may complete, on a system that Dominion owns, in performance of a future contract.

Our foregoing assumption that the termination of CLIN 7 triggered a legal obligation for plaintiff to upgrade the metering, lighting, and distribution at Fort Monroe is, in any event, not established. Plaintiff contends that by terminating CLIN 7 without reacquiring the system, the United States ended the "unregulated" status of the Fort Monroe electrical system and thrust the system into Dominion's regulated rate base. Plaintiff's citations to state law and its corporate policies only generally discuss Dominion providing reasonably adequate service to similarly situated customers, however. As of September 15, 2011, and for at least two years thereafter, Fort Monroe remained federal property. The United States has at all points remained Dominion's customer regarding electricity and utility services at Fort Monroe, first under the Utility Services Contract and now under the Areawide Contract. It is unclear how the services Dominion provides to the United States became automatically subject to the regulations governing Dominion's broader rate base upon termination of CLIN 7. Plaintiff has not established a cause-and-effect relationship between the termination and plaintiff's perceived obligation to perform upgrade work.

In addition to the termination itself, plaintiff argues that splitting the real property ownership triggered a requirement found in its tariff (or elsewhere in state law or its corporate policies) to upgrade metering, lighting, and distribution. Splitting the property did not occur until at least two years after the termination, however. The termination of CLIN 7 and the transfer of property between the United States and Virginia were unrelated transactions. Plaintiff also argues that the change from a single-customer, contiguous federal property to a multi-customer property triggered its obligation to upgrade, even though plaintiff's customer has remained the United States under the Areawide Contract. Its multi-customer problem is largely conjectural at this point. Moreover, as discussed at oral argument, the United States, as the customer under the Areawide Contract, has not ordered this upgrade work. Any future upgrade work would be requested by the Fort Monroe Authority, a separate state government entity with which plaintiff may negotiate a contract in the future.

None of plaintiff's theories, taken together or separately, establish that plaintiff has an existing legal obligation to upgrade the metering, lighting,

and distribution on the Fort Monroe electrical system. More importantly, even if such a requirement exists, plaintiff's arguments do not tie that obligation to what the United States bargained for under Utility Services Contract CLIN 7 or to the termination itself. Because plaintiff cannot connect its anticipated upgrade work to the Utility Services Contract, the court denies plaintiff's motion for summary judgment on Count I and grants the government's cross-motion on that count.

Plaintiff also argues, in Count II, that it is only fair that defendant pay for the estimated cost to upgrade the metering, lighting, and distribution. Plaintiff relies on FAR 49.201(a), which states, "A settlement should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit." Of course, the aim of a termination settlement is to compensate the contractor fairly, but FAR Part 49 does not offer a standalone category for the upgrade costs. As FAR 49.201(a) points out, the termination settlement connects to the work contemplated under the original contract or to work triggered by termination. To the extent that plaintiff argues that it was unfair to terminate a contract that called for 50 years of performance, plaintiff has shown no basis in the contract for that argument, particularly in view of the termination for convenience clause. Plaintiff cannot shoehorn entitlement to costs for upgrading metering, lighting, and distribution that are disconnected from its work under the Utility Service Contract into this general FAR provision. We thus deny plaintiff's motion for summary judgment on Count II and grant the government's cross-motion.

In Count III, plaintiff alternatively seeks $13 million for upgrading the Fort Monroe electrical system on a theory of "Defective Termination." Plaintiff theorizes that terminating the Utility Services Contract also terminated the Bill of Sale and that the United States unilaterally forced the electrical system on Dominion in the termination process. Dominion's argument has no basis in fact or law. The termination notices were legally sufficient. Plaintiff conceded at oral argument that it has, at all relevant times, owned the electrical system, and it did not distinguish between pre-termination and post-termination ownership.

Even if plaintiff had not made this concession, nothing in the Utility Services Contract, the Bill of Sale, or the Easement suggest that a termination of the Utility Services Contract CLIN 7 also revoked or voided the property transfer from the United States to plaintiff. The contract explains that the

electrical system sale is not an acquisition and is not subject to the FAR. The contract establishes that the United States owned the system until the parties executed the Easement, at which point plaintiff owned the system. Both the Bill of Sale and the Easement confirm that, upon execution of those documents, ownership of the system transferred to plaintiff. The fact that the Bill of Sale was "subject to" the contract does not suggest that termination of CLIN 7 unwound the sale of the electrical system to defendant; the contract provided an option for reacquisition that the government declined to exercise. Nothing in the Easement suggests that the termination of CLIN 7 automatically revoked the conveyance or the access rights granted in that document either. The parties' behavior in the termination settlement process reflected this reality: they decreased any settlement amount by the remaining purchase price. Dominion's theory does not reflect the undisputed facts of its transaction with the government nor does it seek relief consistent with its own theory. We therefore grant the government's motion on Count III and deny plaintiff's cross-motion.

In Count IV, plaintiff alternatively seeks $13 million for upgrading the Fort Monroe electrical system because defendant breached the contract by refusing to pay for the metering, lighting, and distribution costs during the termination settlement process. The contract allowed the government to terminate the contract for convenience. The termination clause set out the procedure for determining a settlement and incorporated the cost principles in FAR Part 31 to aid in determining the settlement amount. After the government notified Dominion of the upcoming termination through two termination notices, the government went through the termination settlement proposal process outlined in the termination clause. The government thus fulfilled its duties under the termination for convenience clause. The fact that the government disagreed with Dominion on what the government owes Dominion under that clause is not a breach of the Utility Services Contract. Because plaintiff has not identified a duty set out in the Utility Services Contract that the government breached, we deny plaintiff's motion and grant the government's cross-motion.

Finally, in its motion for summary judgment, plaintiff raised a novel theory of recovery, not found in its complaint (original or amended) or its claims presented to the contracting officer, that Dominion was entitled to an equitable adjustment for increased costs of performance based on the partial termination of the Utility Services Contract, specifically CLIN 7 Fort Monroe. *See* FAR 52.249-2(l). Plaintiff claims $13 million for metering,

lighting, and distribution costs, this time as relief for increased costs of performance. In its cross-motion and response, defendant moved for the court to dismiss this claim, because plaintiff did not raise a claim for equitable adjustment before the contracting officer nor in its complaints.

As an initial matter, plaintiff did not move to amend its complaint to raise this distinct claim prior to summary judgment. The court will not consider a claimed raised after ample time to amend the complaint and when defendant did not have an opportunity to prepare for the claim during discovery. Moreover, plaintiff did not submit a claim to the contracting officer for an equitable adjustment for increased costs of performance due to a partial termination under FAR 52.249-2(l). The court lacks jurisdiction to entertain a claim for costs that plaintiff did not raise to the contracting officer. 41 U.S.C. §§ 7101-09, 7103 (2018). Plaintiff's theory is new, as is the category of relief it seeks and the operative facts relating to costs increasing under the other two contract line items. *See K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015). Thus, plaintiff's new claim must be dismissed for lack of jurisdiction.

                               CONCLUSION

In sum, we deny plaintiff's motion for summary judgment on Counts I, II, and IV. We grant the government's cross-motion for summary judgment on Counts I, II, and IV. We also grant the government's motion for summary judgment on Count III and deny plaintiff's untimely request for summary judgment on that count. We dismiss the equitable adjustment claim, to the extent it can be characterized as such, raised in plaintiff's motion for summary judgment. The Clerk is directed to enter judgment for defendant. No costs.


                               s/Eric G. Bruggink
                               ERIC G. BRUGGINK
                               Senior Judge